**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GREG AND TWILA KERR, and ROBERT KNOWLES, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Civil Action No. |
| v. | |
| GENERAL MOTORS LLC, | CLASS ACTION COMPLAINT |
| Defendant, | JURY TRIAL DEMANDED |

## I.    INTRODUCTION

1.      Plaintiffs Greg and Twila Kerr and Robert Knowles ("Plaintiffs") bring this action individually and on behalf of all persons in the United States, and in the alternative on behalf of all persons in the states of Texas and Florida, who purchased or leased any 2020-2024 Chevrolet Equinox or GMC Terrain vehicles ("Class Vehicles"), against Defendant General Motors LLC ("Defendant" or "GM").  The allegations herein are based on personal knowledge as to Plaintiffs' own conduct and as to other matters are made based on an investigation by counsel, including analysis of publicly available information.

2.      This is a consumer class action concerning the misrepresentation of materials facts, and the failure to disclose material facts and safety concerns to consumers.

3.      Defendant manufactured, marketed, distributed, and sold the Class Vehicles without disclosing that the Class Vehicles were being sold with a defect that materially affects the vehicles' ability to operate as intended and to provide safe and reliable transportation. Instead, GM

equipped these vehicles with a defective fuel pump and falsely marketed the vehicles as safe to drive, durable, and reliable.

4.     The Class Vehicles are equipped with fuel pumps and/or fuel pump power control modules that exhibit defects in design, manufacturing, and/or workmanship which cause these components to prematurely fail or operate intermittently (the "Defect" or the "Fuel Pump Defect"). The Defect causes the flow of fuel from the gas tank to the engine to be interrupted. Without enough fuel, the engine can fail while the vehicle is being driven, leading to stalling and loss of motive power, and increasing the threat of collision.

5.      As early as 2019, GM knew of the existence and severity of the Defect. However, GM failed to disclose the Defect, and instead touted the quality, durability, reliability, and performance of the Class Vehicles via its public statements and multimedia marketing campaigns. GM also advertised that the vehicles were of high quality, with exceptional performance and a comparatively low cost of ownership.

6.     Discovery will show that the Defect is the result of: (1) a supplier manufacturing defect in the fuel pump power control modules; (2) the use of sub-standard materials in the manufacture of the fuel pump preventing the maintenance of adequate pressure; (3) a defective design of the fuel pump and/or fuel pump power control module; and/or (4) poor quality-control procedures which fail to prevent such defectively manufactured and/or designed components from being installed in the Class Vehicles.  The Defect causes unsafe driving conditions as the Class Vehicles have a significant chance of failing while being driven because fuel cannot reach the engine.  Further, even the lesser symptoms of the Defect affect vehicle performance and safety, making it more difficult for a driver to control the vehicle as it loses power, hesitates, sputters,

struggles to move, or misfires.  In some instances, the vehicle fails to start entirely, undermining the essential purpose of the vehicle.

7.      The Defect is inherent in each Class Vehicle and was present at the time of sale or lease to each Class Member.  Each of the fuel pumps and fuel pump modules installed in the Class Vehicles is identical or substantially similar, in that GM made no material changes to the fuel pump over time.  The fuel pump and the fuel pump control module are distributed by AC Delco, GM's own subsidiary.

8.      In addition to being unsafe, the Defect causes internal damage to other components; notably, the engine, which is subject to damage when supplied with insufficient fuel.  Because GM has no repair for the Defect and merely replaces defective parts with equally defective parts, consumers are often faced with repeated repairs since the replacement parts do not remedy the Defect. Further, partial or band-aid type repairs leave unaddressed the damage caused to other components which, given the cumulative harmful effects of the Defect, undermines the expected life of the vehicle even in circumstances in which repairs are made before complete engine failure.

9.      Simply replacing the fuel pump and/or the fuel pump control module can cost anywhere from $1,200 to $2,000.  GM knows there is no permanent repair for the Defect, yet GM continues to direct its authorized dealerships merely to replace certain components with equally defective replacement components while informing consumers that their vehicles are fixed, whether or not those repairs are made under warranty. GM has purposefully concealed the existence and extent of the Defect to transfer the costs of repairs from GM to unsuspecting consumers.

10.     The Defect not only decreases the value of the Class Vehicles, because there is no permanent repair, it can endanger drivers and passengers in the vehicles. For example, when the

vehicles suddenly lose power, hesitate, or stall, drivers will be unable to maintain speed on highways or other roadways, leading to an increased chance of collision.  The Defect also creates uncertainty for the owners and lessees of the Class Vehicles, who cannot rely on their vehicles to operate safely or reliably, even after repairs have been performed.

11.     Despite knowing that the Class Vehicles are equipped with fuel pumps and/or fuel pump control modules that suffer from a defect in the design, manufacturing, materials, and/or workmanship that causes them to prematurely fail well before their useful and expected life, while also damaging internal engine components, GM failed to disclose such information about the Defect to the public and failed to offer a permanent remedy for the Defect.  Rather, GM represented that the fuel pumps and/or fuel pump modules installed in Class Vehicles were of high-quality, reliable, and adequate for the vehicles' intended use. GM's intentional non-disclosure and omission of these defects artificially inflated the purchase and lease price for these vehicles.  Had GM disclosed the Defect, Plaintiffs and the Class members would not have purchased their vehicles or would have paid less for them.

12.     Federal law imposes a duty upon automobile manufacturers including GM to ensure that, before selling vehicles, they function properly and safely and are free from material defects which undermine the ability of the vehicle to provide safe, reliable transportation.  Federal law further requires that when an automobile manufacturer discovers a defect, it must disclose the defect and remedy the problem or cease selling the car.  Further, when a company provides a warranty, it must honor that warranty.  GM deceived its customers when it promised to stand by the warranty it issued to purchasers when it had no intent to do so, when it failed to honor the warranties by providing only illusory repairs, when it sold vehicles that were not capable of

providing safe, reliable transportation, and when it failed to disclose the Class Vehicles' safety defect.

13.    Plaintiffs and members of the Classes reasonably expected that GM's representations—specifically, that the Class Vehicles were properly engineered and equipped to handle ordinary, public road driving—would be true and complete and would not omit material information.  In reality, however, Defendant concealed and failed to disclose to Plaintiffs and the Class Members the Defect and its significant safety risk, including suddenly misfire, hesitation, bucking, and even partial or complete loss of motive power during operation. Moreover, Defendant concealed that, as a result of the Defect, the Class Vehicles will require significant, costly repairs.

14.    Based on pre-production testing and design failure mode analysis, warranty claims, replacement part orders, ongoing communications with its suppliers regarding defective parts, and consumer complaints, including complaints to NHTSA, and testing done in response to those complaints, as well as other sources of internal data not available to consumers, Defendant was aware of the Defect in the Class Vehicles but concealed the Defect from Plaintiffs and members of the Classes. Indeed, despite being aware of the Defect and numerous complaints, GM knowingly, actively and affirmatively omitted and/or concealed the existence of the Defect to increase profits by selling additional Class Vehicles and by unlawfully transferring the cost of repair and replacement of the defective parts to Plaintiffs and members of the Classes.

15.    GM has exclusive knowledge of, and has been in exclusive possession of, information pertaining to the Defect, which was material to Plaintiffs and Class Members, who could not reasonably know of the Defect. GM has not disclosed the Defect to the purchasers or lessees, like Plaintiffs, at the point of purchase or through advertisements or marketing materials. Such full and complete disclosures would have influenced Class Members' purchase decisions and

the purchase price they paid. Under all circumstances, GM had a duty to disclose the latent Defect at the point of sale of the Class Vehicles. Instead, GM failed and refused—and continues to refuse—to disclose the Defect and provide a meaningful remedy to those who have suffered economic harm as a result of the Defect.

16.     The Defect is latent, it presents safety risk to drivers and passengers, it causes damages to internal components over time, and renders vehicles equipped with the defective fuel pumps and/or fuel pump control modules imminently dangerous. It renders the Class Vehicles unfit for the ordinary and advertised use of providing safe and reliable transportation. As such, the Defect presents a breach of the implied warranty of merchantability.

17.     Additionally, because GM concealed and failed to disclose the Defect, owners have suffered and continue to suffer substantial damages and should be entitled to the benefits of all tolling and estoppel doctrines.

18.     As a direct and proximate result of GM's concealment of, and failure to disclose, the Defect, Plaintiffs and Class members: (1) overpaid for the Class Vehicles  because the Defect significantly diminishes the value of the Vehicles; (2) have Vehicles that suffer premature fuel pump and fuel pump control module failures;  (3) have and/or must expend significant money to have their Vehicles (inadequately) repaired; (4) have vehicles that have a lower resale value; and (5) are not able to use their Vehicles for their intended purpose and in the manner GM advertised.

19.     In the United States, GM provides warranty coverage for Class Vehicles under one or more warranties.  For illustrative purposes, GM currently offers a 3-year/36,000 mile basic limited warranty and a 5-year/60,000 mile powertrain limited warranty for every vehicle, including the Class Vehicles.

20.     GM breached its express and implied warranties through which GM promised to, *inter alia*: (1) provide Class Vehicles fit for the ordinary and advertised purpose for which they were sold; and (2) repair and correct manufacturing defects or defects in materials or workmanship of any parts GM supplied, including the fuel pump and/or fuel pump control module.  Because the Defect was present at the time of sale or lease of the Class Vehicles and concealed from Plaintiffs and members of the Classes, GM, was required to repair or replace these components under the terms of the warranties.  Yet, discovery will show that GM has failed to repair or replace the defective and damaged parts, free of charge, under GM's warranties.

21.     GM's decision to sell the Class Vehicles without disclosing its specialized knowledge of the Defect also violates consumer state laws.

22.     Plaintiffs and Class members have purchased and leased Class Vehicles that they would not otherwise have purchased or leased, or would have paid less for, had they known of the Defect at the point of sale.  Plaintiffs and Class members have consequently suffered ascertainable losses and actual damages. Moreover, Plaintiffs seek equitable remedies, including *inter alia*, an order that the Class Vehicles are defective and injunctive relief preventing GM from continuing its wrongful conduct as alleged herein.

## I.     THE PARTIES

### Greg and Twila Kerr

23.     Plaintiffs Greg and Twila Kerr are citizens of Florida, domiciled in Hudson, Florida.

24.     On or about October 13, 2022, Plaintiffs Kerr purchased a pre-owned 2021 Chevrolet Equinox with approximately 32,000 miles on the odometer from Ed Morse Chevrolet dealership located in Delray Beach, Florida.

25.    Plaintiffs Kerr purchased their Class Vehicle primarily for personal, family, or household use.

26.    Passenger safety and reliability were important factors in Plaintiffs Kerr's decision to purchase their vehicle.  Before making their purchase, Plaintiffs Kerr researched the vehicle on the internet by visiting the dealership website and spoke to a representative of the authorized-GM dealership who assured them of the quality, safety, and reliability of the vehicle. Plaintiffs Kerr selected and purchased their Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

27.    None of the information provided to Plaintiffs Kerr disclosed any defects in the fuel pump or fuel pump module.  GM's omissions were material to Plaintiffs Kerr.

28.    Had GM disclosed the Defect before Plaintiffs Kerr purchased their vehicle, they would have seen such disclosures and been aware of them.  Indeed, GM's misstatements and omissions were material to Plaintiffs Kerr.  Like all members of the Class, Plaintiffs Kerr would have not purchased their Class Vehicle, or would have paid less for the vehicle, had they known of the Defect.

29.    In addition, at the time Plaintiffs Kerr purchased their vehicle, and in purchasing their vehicle, they relied upon representations from GM and its authorized dealership that they saw during their internet research, heard from the salesperson, and reviewed on the dealership materials that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiffs Kerr relied on those representations and the omission of the disclosure

of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

30.     At all times during their ownership of the vehicle, Plaintiffs Kerr properly maintained and serviced the Class Vehicle according to GM's recommended maintenance guidelines.

31.     In or about March 2024, with approximately 40,000 miles on the odometer, Mr. and Mrs. Kerr's vehicle began to experience the Defect, specifically when the vehicle became difficult to start.

32.     Mr. Kerr called Castriota Chevrolet, INC., a GM-authorized dealership located in Hudson, Florida, and complained about his vehicle. He was told there was nothing to be done until the vehicle died completely.

33.     After the vehicle experienced the same starting issues, Mr. Kerr called another GM-authorized dealership, Coast Buick GMC, located in Port Richey, Florida, looking to purchase the fuel pump module. The dealership informed Mr. Kerr that it did not have the part in stock, confirmed that GM had problems with its fuel pump modules and in fact had a new part number that was also not in stock.

34.     Mr. and Mrs. Kerr subsequently purchased a fuel pump module from an independent parts supplier and replaced the part themselves.  This resolved, at least temporarily, the problems they experience starting their vehicle.

35.     To date, Plaintiffs Kerr have received no notification from GM about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage.

36.     As a result of the Defect, Plaintiffs Kerr have lost confidence in the ability of their Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless, GM fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiffs Kerr will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although they would like to do so.

37.     At all times, Plaintiffs Kerr, like all Class Members, have attempted to drive their Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Robert Knowles**

38.     Plaintiff  Robert Knowles is a citizen of Texas, domiciled in Fort Worth, Texas.

39.     On or around May 17, 2023, Plaintiff Knowles purchased a new 2023 GMC Terrain from a GM-authorized dealership, Bruner Motors, Inc. in Stephenville, Texas.

40.     Plaintiff Knowles purchased his Class Vehicle primarily for personal, family, or household use.

41.     Passenger safety and reliability were important factors in Plaintiff Knowles' decision to purchase his vehicle.  Before making his purchase, Plaintiff Knowles researched the vehicle on the internet by visiting the dealership website, spoke to a representative of the authorized-GM dealership who assured him of the quality, safety, and reliability of the vehicle, and test drove the vehicle he ultimately purchased.  Plaintiff Knowles selected and purchased his Class Vehicle because the vehicle was represented to be and was marketed as a high-quality vehicle capable of providing safe, reliable transportation.  The purchase was made in part on the advertised safety, reliability, and quality of the vehicle and its components, including its Engine.

42.     None of the information provided to Plaintiff Knowles disclosed any defects in the fuel pump or fuel pump module.  GM's omissions were material to Plaintiff Knowles.

43.     Had GM disclosed the Defect before Plaintiff Knowles purchased his vehicle, he would have seen such disclosures and been aware of them.  Indeed, GM's misstatements and omissions were material to Plaintiff Knowles.  Like all members of the Class, Plaintiff Knowles would have not purchased his Class Vehicle, or would have paid less for the vehicle, had he known of the Defect.

44.     In addition, at the time Plaintiff Knowles purchased his vehicle, and in purchasing his vehicle, he relied upon representations from GM and its authorized dealership that he saw during his internet research, heard from the salesperson, and reviewed in the dealership materials that the vehicle was fully functional, safe, durable, reliable, and that the engine operated correctly and effectively.  Plaintiff Knowles relied on those representations and the omission of the disclosure of the Defect, in purchasing the vehicle, and absent those representations and omissions, would not have purchased the vehicle or would have paid less for it.

45.     At all times during his ownership of the vehicle, Plaintiff Knowles properly maintained and serviced his Class Vehicle according to GM's recommended maintenance guidelines.

46.     In or about August 2023, only three months of owning the vehicle and with approximately 5,500 miles on the odometer, Plaintiff Knowledges began to experience the Defect. Specifically, the engine starting hesitating, stalling, and making noises.

47.     As a result, Plaintiff Knowles brough his vehicle to the dealer who purported to perform a repair.

48.     When the issues persisted, Plaintiff Knowles brought the vehicle back to the dealer in October, and the dealer again purported to perform a repair. Again, the repair failed to resolve the issues.

49.     Plaintiff Knowles brought the vehicle back the dealer in or around March 2024 with approximately 44,000 miles on the odometer. The dealership has confirmed that the issues were caused by the fuel pump but has not completed the repair.

50.     To date, Plaintiff Knowles has received no notification from GM about any potential permanent repair or modification, or change to the maintenance schedule which would either repair the Defect or prevent the Defect from causing additional damage.

51.     As a result of the Defect, Plaintiff Knowles has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Until and unless, GM fully discloses the Defect, a permanent repair or modification, and/or a change to the maintenance schedule to prevent the Defect from causing damage, Plaintiff Knowles will be unable to rely on future advertising or labeling of the Class Vehicles, and so will not purchase another Class Vehicle although he would like to do so.

52.     At all times, Plaintiff Knowles, like all Class Members, has attempted to drive his Class Vehicle in a foreseeable manner and in a manner in which it was intended to be used.

**Defendant**

53.     Defendant General Motors LLC is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan. General Motors LLC is registered to do business in the State of Delaware. The sole member and owner of General Motors LLC is General Motors Holdings LLC.

54.     General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.  General Motors Holdings LLC's only member is General Motor Company, a Delaware corporation with its principal place of business in the State of Michigan.  General Motors Company has 100% ownership interest in General Motors Holdings LLC.  General Motor Company also owns ACDelco, a company which makes and/or distributes parts for GM vehicles to be used when the vehicles are manufactured and also to be sold to the public when those parts require repair.

55.     General Motors LLC, through its various entities, designs, manufactures, markets, distributes, services, repairs, sells, and leases passenger vehicles, including the Class Vehicles, nationwide and in Delaware.  General Motors LLC is the warrantor and distributor of the Class Vehicles in the United States.

56.     At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and motor vehicle components in Delaware and throughout the United States of America.

57.     In order to sell vehicles to the general public, GM enters into agreements with dealerships who are then authorized to sell GM-branded vehicles such as the Class Vehicles to consumers such as Plaintiffs.  These agreements also designate the authorized dealerships to conduct warranty and recall repairs on GM's behalf.  All service and repairs performed at an authorized dealership are also completed according to GM's explicit instructions, issued through service manuals, technical service bulletins ("TSBs"), preliminary information bulletins ("PIs"), information service bulletins, and other documents, often only referred to by a "Document ID." GM also provides instructions for service and repair via the Service Information ("SI") system, a collection of vehicle diagnostic and service repair manuals, as well as bulletins, recalls, and other

current repair information. GM also maintains Techline Connect to be used for vehicle calibrations, GM's Global Diagnostic System software and scan tool hardware updates to be used by GM authorized dealerships and made available to independent third-party repair shops for a fee. Per the agreements between GM and the authorized dealers, consumers such as Plaintiffs can receive services under GM's issued warranties at dealer locations that are convenient to them. Furthermore, GM's authorized dealerships are only able to sell new vehicles purchased directly from GM, as well as ACDelco parts for those vehicles to be used in service and repairs. As such, GM directly profits from all sales of new vehicles at authorized GM dealerships and directly profits from all sales of ACDelco parts at those dealerships.

58.     GM also develops and disseminates the owners' manual, warranty booklets, maintenance schedules, advertisements, and other promotional materials relating to the Class Vehicles. GM is also responsible for the production and content of the information on the Monroney Stickers, as well as other window stickers.

59.     GM is the drafter of the warranties it provides to consumers nationwide, the terms of which unreasonably favor GM. Consumers are not given a meaningful choice in the terms of the warranties provided by GM, and those warranties are offered on a "take it or leave it" basis.

60.     GM warrants the Class Vehicles and is the drafter of those warranties, the terms of which unreasonably favor GM. The warranties given by GM to Plaintiffs and consumers are presented on a "take it or leave it" basis, and Plaintiffs and consumers are not given a meaningful choice in the terms of the warranties provided by GM.

## II.   JURISDICTION AND VENUE

61.     This action is properly before this Court and this Court has subject matter jurisdiction over this action under the Class Action Fairness Act. At least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs. *See* 28 U.S.C. § 1332(d)(2)(A).

62.     In addition, under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over the state law claims because all of the claims are derived from a common nucleus of operative facts and are such that Plaintiffs would ordinarily expect to try them in one judicial proceeding.   Further, this Court may also exercise supplemental jurisdictions over Plaintiffs' Magnusson-Moss Warranty Act claims.

63.     This Court has personal jurisdiction over Defendant because it is incorporated in the State of Delaware; has consented to jurisdiction by registering to conduct business in the state; maintains sufficient minimum contacts in Delaware; and otherwise intentionally avails itself of the markets within Delaware through promotion, sale, marketing and distribution of its vehicles, which renders the exercise of jurisdiction by this Court proper and necessary as GM is "at home" in Delaware.

64.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(a)-(c). A substantial part of the events or omissions giving rise to the claims occurred in this District. Plaintiffs may properly sue GM in this District, GM's state of incorporation.

### III.   FACTUAL ALLEGATIONS

**A.    Background of the subject Fuel Pump and Fuel Pump Control Modules**

65.    In automobiles, the fuel pump transfers fuel from the fuel tank to the engine.  In modern vehicles, fuel pumps are powered by a small electric motor.  To operate properly and in concert with the engine, the fuel pump must draw up the fuel from the tank and send it down via a fuel line to the engine while also pressurizing the fuel according to the limit set by fuel pump control module. The fuel pump control module, also referred to as the fuel pump flow control module, electronically controls the fuel pump and sets the pressure limits for the fuel.

66.    In the Class Vehicles, the fuel pump is located inside the fuel tank. The fuel pump control module is located underneath the left-side trim near the spare tire in the rear of the vehicle. The expected lifespan of these components is the life of the vehicle itself, between 150,000 and 200,000 miles.  In the Class Vehicles, these components fail before reaching 100,000 miles.

67.    The fuel pump control module, in turn, communicates with the engine control module (the "ECM")—a separate computer that operates and controls the engine.  In particular, the ECM directs the fuel pump control module to initiate the fuel pump's operation upon the vehicle's start-up and also communicates to the fuel pump control module the engine's changing fuel flow needs.  The fuel pump control module then sends the appropriate voltage to the fuel pump, which in turn pumps the fuel from the tank into the gas line running towards the engine.  In Figure 1, below, the fuel pump is denoted by the number eight and the fuel pump control module is denoted by the number 15.

16



**FIGURE 1**

68.     Discovery will show that all of the Class Vehicles have the same fuel pumps and the same fuel pump control modules.  Moreover, these fuel pumps and fuel pump control modules are supplied to GM by AC Delco, which use components from various other suppliers.

69.     At the time each Class Vehicles left GM's possession and control, they each incorporated the same fuel pump and fuel pump control module.  As such, they each had an inherent and uniform latent Defect.  The Defect causes the flow of fuel from the gas tank to the engine to be interrupted.  As result, Plaintiffs and Class members experience audible ticking noises from the rear of the vehicle, loss of motive power, inability to start the engine, hesitation, stalls, bucking, decreased engine performance including fuel economy, and/or premature engine wear of internal components such as the intake valves in the engine. Ultimately, the Defect leads to stalling and loss of motive power, increasing the threat of collision.

70.     Many members of the Class first become aware of the Defect when their vehicle suddenly stopped on the road. At the same time, the warning light on the dashboard may illuminate, as a result of the ECM or fuel pump control module detecting a problem and recording a "diagnostic trouble code," or DTC, which lists the condition which alerted the computer. As a result of the Defect, the following DTCs may be set, including P0089 (fuel pressure is not at specification); P0191 (potential abnormality in fuel pressure readings); P0300 (random or multiple cylinder misfire); P0301-0306 (engine misfire on the indicated cylinder); P228C (fuel pressure too low); P228D (fuel pressure too high); P2635 (Fuel Pump Flow Performance); or any other DTC that shows miscommunication between the ECM, the powertrain control module, or fuel pressure sensors on the one hand and the fuel pump control module on the other.

71.     The Class Vehicles are also equipped with Stop/Start, a feature intended to reduce fuel consumption by turning off the engine when the vehicle is at a full stop and idling, such as when at a stoplight or stop sign.  This feature is controlled by the ECM, which first detects that the vehicle is not in motion and that the brake is depressed.  The ECM then sends a signal to the fuel pump control module that fuel is not needed and turns off the vehicle's ignition.  The fuel pump control module shuts down the fuel pump and gas stops flowing from the tank to the engine.  When the brake is released, the ECM sends another signal to the fuel pump control module and also turns on the vehicle's ignition.  Due the Defect, the Class Vehicles are at greater risk of failing to start after being turned off by this vehicle on their way to their destination.

72.     GM was well aware of the Defect and its attendant problems as early as 2019. When vehicles come into GM's authorized dealerships with these diagnostic trouble codes, dealerships are instructed to clear the codes from the ECM and may additionally be instructed to replace the fuel pump, the fuel pump control module, or both.  Such illusory repairs have not

prevented Class Vehicles from exhibiting the symptoms of the Defect, and as such, GM's dealerships and independent mechanics have been inundated with requests for repairs by members of the Class, such that it is difficult to source replacement fuel pumps and/or fuel pump control modules on the market due to their high demand.  Further, many Class Vehicles have undergone attempted repairs multiple times, which indicates that GM is replacing defective components with the same equally defective replacements.

73.     Discovery will show that GM has been aware, since at least 2019, that Class Vehicles exhibit premature fuel pump and/or fuel pump control module failures at rates and in a manner that do not confirm to industry standards, and that the Defect substantially decreases the value of the Class Vehicles, forcing owners/lessees of the Class Vehicles to incur significant out of pocket expenses or hope that GM will cover the cost to have the fuel pump and/or the fuel pump control module repaired or replaced.

74.     Even then, repairing or replacing the defective parts does not resolve the Defect because the consumer is left with an engine damaged by defective components and/or receives another defective component in its place. As such, the Defect endangers the drivers and passengers of the vehicles, while also creating uncertainty for the drivers of the Class Vehicles who cannot reasonably rely on their vehicles to operate consistently, reliably, safely or as represented by GM.

### B.     GM's Warranties

75.     GM provided all purchasers or lessees of the Class Vehicles with a New Vehicle Limited Warranty ("NVLW").  The terms of these warranties are non-negotiable and GM exercises sole authority in determining whether and to what extent a particular repair is covered under the warranties it offers.

76.     Moreover, although GM offers a single type of extended warranty, which merely extends the durational limits for a fee of thousands of dollars, no other terms are changed, leaving

GM the sole arbiter of whether it will honor the warranty.  In particular, GM may decide that a defect is a "design defect" not covered under the warranties it provides, extended or otherwise, and thus not provide warranty coverage.

77.     Further, GM's authorized dealerships also sell extended warranties from third-party suppliers.  However, those warranties exclude manufacturer's defects, including those like the Defect.

78.     The NVLW for the Class Vehicles included a "Bumper-to-Bumper" warranty, a Powertrain warranty, and an Emission Control Systems Warranty, stated in relevant part:[1]

**What is Covered**

**Warranty Applies**

This warranty is for [GM] vehicles registered in the United States and normally operated in the United States or Canada, and is provided to the original and any subsequent owners of the vehicle during the warranty period.

**Repairs Covered**

The warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period. Needed repairs will be performed using new, remanufactured, or refurbished parts.

**No Charge**

Warranty repairs, including towing, parts, and labor, will be made at no charge.

**Obtaining Repairs**

To obtain warranty repairs, take the vehicle to a [GM] dealer facility within the warranty period and request the needed repairs. Reasonable time must be allowed for the dealer to perform necessary repairs.

**Warranty Period**

The warranty period for all coverages begins on the date the vehicle is first delivered or put in use and ends at the expiration of the coverage period.

**Bumper-to-Bumper Coverage**

[1] This sample warranty displays certain durational limits.  Discovery will show that that the warranties issued with the sale or lease of Class Vehicles are identical with the exception of the durational limits.  The durational limits of each named plaintiff's warranty are outlined *supra*.

The complete vehicle is covered for 3 years or 36,000 miles, whichever comes first, except for other coverages listed here under "What is Covered" and those items listed under "What is Not Covered" later in this section.

**Powertrain Component Warranty Coverage**

Coverage is for the first 5 years or 60,000 miles whichever comes first. []

****

*Exclusions:* Excluded from the powertrain coverage are sensors, wiring, connectors, engine radiator, coolant hoses, coolant, and heater core. Coverage on the engine cooling system begins at the inlet to the water pump and ends with the thermostat housing and/or outlet that attaches to the return hose. Also excluded is the starter motor, entire pressurized fuel system (in-tank fuel pump, pressure lines, fuel rail(s), regulator, injectors, and return line) as well as the Engine/Powertrain Control Module and/or module programming.

****

**Other Terms:**  This warranty gives you specific legal rights and you may also have other rights which vary from state to state.

GM does not authorize any person to create for it any other obligation or liability in connection with these vehicles.  **Any implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty. Performance of repairs and needed adjustments is the exclusive remedy under this written warranty or any implied warranty. GM shall not be liable for incidental or consequential damages, such as, but not limited to, lost wages or vehicle rental expenses, resulting from breach of this written warranty or any implied warranty.***

* Some states do not allow limitations on how long an implied warranty will last or the exclusion or limitation of incidental or consequential damages, so the above limitations or exclusions may not apply to you.

****

The emission warranty on your vehicle is issued in accordance with the U.S. Federal Clean Air Act. Defects in material or workmanship in GM emission parts may also be covered under the New Vehicle Limited Warranty Bumper-to-Bumper coverage. In any case, the warranty with the broadest coverage applies.

**What Is Covered**

The Emissions related parts covered under Federal and California Warranty are listed under the Emission Warranty Parts List 0 21. How to Determine the Applicable Emissions Warranty State and Federal agencies may require a different emission warranty coverage depending on:

- Whether the vehicle conforms to regulations applicable to light duty or heavy duty emission control systems.
- Whether the vehicle conforms to or is certified for California regulations in addition to U.S. EPA Federal regulations.

All vehicles are eligible for Federal Emissions Control Warranty Coverage. If the emissions control label contains language stating the vehicle conforms to California regulations, the vehicle is also eligible for California Emissions Warranty Coverage.

**Federal Emission Control System Warranty**

**Federal Emissions Warranty Coverage**

- For Passenger Car or Light Duty Truck with a Gross Vehicle Weight Rating (GVWR) of 8,500 lbs. or less

    – 2 years or 24,000 miles, whichever comes first for Emissions related parts
    – 8 years or 80,000 miles, whichever comes first for Emissions select components; catalytic converters, engine control module, transmission control module and other diagnostic emissions critical-electronic control units

****

**Federal Emission Defect Warranty**

GM warrants to the owner the following:

- The vehicle was designed, equipped and built to conform at the time of sale with applicable regulations of the U.S. Federal Environmental Protection Agency (EPA).

- The vehicle is free from emissions-defects in materials and workmanship which cause the vehicle to fail to conform to those regulations during the emission warranty period.

- Emission-related defects in the genuine GM parts listed under the Emission Warranty Parts List, including related diagnostic costs, parts, and labor are covered by this warranty.

22

****

### Owner's Warranty Responsibilities

As the vehicle owner, you are responsible for the performance of the scheduled maintenance listed in your owner manual. GM recommends that you retain all maintenance receipts for your vehicle, but GM cannot deny warranty coverage solely for the lack of receipts or for your failure to ensure the performance of all scheduled maintenance. You are responsible for presenting your vehicle to a Chevrolet dealer selling your vehicle line as soon as a problem exists. The warranted repairs should be completed in a reasonable amount of time, not to exceed 30 days. As the vehicle owner, you should also be aware that Chevrolet may deny warranty coverage if your vehicle or a part has failed due to abuse, neglect, improper or insufficient maintenance, modifications not approved by Chevrolet, or if the defect is not emissions-related.

If you have any questions regarding your rights and responsibilities under these warranties, you should contact the Customer Assistance Center at 1-800-222-1020 or, in California, write to:

> State of California Air Resources Board
> Mobile Source Operations
> Division P.O. Box 8001
> El Monte, CA 91731-2990

### C.       GM's Omissions and Misrepresentations Regarding the Class Vehicles

79.     Notwithstanding GM's knowledge of the Defect, as more specifically explained herein, GM, through media outlets including GM media, touted the ability of the Class Vehicles to be driven reliability. The most basic task of any vehicle is to provide transportation, but GM failed to disclose the Defect interfered with that purpose in any of its statements about the Class Vehicles, including in brochures, Moroney Stickers, warranty booklets, and owner's manuals. GM's statements about both the Equinox and the Terrain consistently touted the safety and fuel economy of the vehicles, without mentioning that the Defect which had an associated safety risk and negative effect on the fuel economy possible in the vehicles.

80.     For example, in the 2020 brochure for the Chevrolet Equinox, GM stated, "Stop/start engine technology, standard on every Equinox, automatically shuts down the engine as

you come to a stop under certain driving conditions, such as a stoplight. The engine seamlessly restarts when you take your foot off the brake." At no point did GM acknowledge that the Defect could interfere with Stop/start or increase the risk of a stall.

81.     GM also extolled the many safety features of the Equinox, labeling it "Ready and Vigilant," by being equipped with ten separate safety features including automatic emergency braking, lane keep assist and rear collision alerts.  GM failed, however, to mention the greatest safety risks of the vehicle, including the Defect, either in the brochure itself or in the owner's manual to which the brochure directed consumers to read "more important feature limitations and information."

82.     The 2021 through 2023 brochures for the Chevrolet Equinox declared, "every…Equinox comes standard with Chevy Safety Assist, a comprehensive package of driver assistance features that offer peace of mind on the road" and devotes a full page to all the various features available in the vehicles.

83.     The 2020 GMC Terrain brochure and subsequent year brochures advertises that the vehicle comes with "Standard GMC Pro Safety," including automatic emergency breaking, lane keep assistant and forward collision alert.  However, it fails to mention the Defect, even when warning drivers "[v]isibility, weather and road conditions may affect feature performance." Instead, neither brochure nor the owner's manual, to which consumers are directed for more information, contain any mention of the Defect.  This warning is included in all the Class Vehicle brochures, none of which mention the Defect or its associated safety risk.

84.     GM had numerous opportunities to warn prospective purchasers that the Class Vehicles contained a serious defect that could not only affect the ability of the cars to be driven, but also carried a significant associated safety risk of stalls, hesitation, and lurching, increasing the

risk of collisions.  But none of the statements that GM published and distributed about the vehicles, including brochures, commercials, fact sheets, window stickers, warranty booklets, and owner's manuals contained any mention of the Defect.

85.     GM further touts the Class Vehicles and makes other express representations and warranties about their quality, durability, and performance. However, in truth, GM knew before selling the Class Vehicles that they suffered from the Defect, but never disclosed that knowledge. Had GM disclosed that knowledge, Plaintiffs and Class members would not have purchased their vehicles or would not have purchased them for the same price.

### D.     GM Had Exclusive and Superior Knowledge of the Defect

86.      GM fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Class the Defect in Class Vehicles, even though GM knew or should have known of the design, material, manufacturing, and/or workmanship defects in the Class Vehicles.

87.     Knowledge and information regarding the Defect were in the exclusive and superior possession of GM and its network of authorized dealerships, and that information was not provided to Plaintiffs and members of the Classes – either before their purchase or lease of Class Vehicles or when they sought repairs for their vehicles.  Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, previous failures of fuel pump and fuel pump control modules from the same supplier, quality control audits of the fuel pump and fuel pump control modules components, early consumer complaints made to GM's network of dealerships, aggregate warranty data compiled from those dealers, repair orders and parts data received from those dealers, aggregate auto parts stores, consumer, and independent mechanic orders of replacement parts, and consumers complaints to dealers and NHTSA and testing performed in response to those complaint, *inter alia*, GM was aware or should have been

aware of the Defect in the Class Vehicles.  Instead, GM fraudulently concealed the Defect and its associated safety risk from Plaintiffs and members of the Classes.

88.     GM knew, or should have known, that the Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles or within applicable warranty periods.

89.     Notwithstanding GM's exclusive and superior knowledge of the Defect, GM failed to disclose the Defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continues to sell Class Vehicles suffering from the Defect. GM intentionally concealed that the Defect presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public.

90.     In fact, before the initial Class Vehicles went on sale, GM put the vehicle through its extensive pre-production testing to both find flaws and decide which it would correct prior to sale. Discovery will show that GM's decision is often based on whether the found issue is more likely to occur within the warranty period or outside the warranty, i.e. whether GM or its customers are likely to bear the cost of the repair. GM's testing is divided into three parts: 1) mule testing; 2) early prototype testing; and 3) production line testing.  The first phase, mule testing, takes place after the concept car phase and often precedes years before a vehicle is placed into production. Early prototype testing takes place approximately a year to two years before production, while production line testing takes places six to nine months prior to production.  Each of these phases is designed to review defects in vehicles, including in any of their components, prior to being mass-produced.  In particular, early prototype testing performed at GM's Milford Proving Ground in

Milford, Michigan, would have revealed to GM problems with the fuel pumps and/or fuel pump control modules.

91.     Discovery will also show, as a result of their exclusive and superior knowledge regarding the Defect, GM released several bulletins describing issues related to the Defect to their exclusive network of dealerships. On December 19, 2019, GM first created Preliminary Information PIT5727A entitled "SES MIL On, DTC P2635 Stored." SES MIL On indicates that the malfunction indicator lamp ("MIL"), otherwise known as a dashboard warning light, is on, while DTC P2635 indicates that there is an imbalance in the air-to-fuel ratio in the engine due to a fuel pump low flow. The vehicles involved in this bulletin were the 2020 Chevrolet Equinox and the 2020 GMC Terrain.[2] GM indicated that "Engineering is investigating this concern," and directed technicians to check fuel pump pressure at vehicle idle. If the pressure was higher than 58psi, technicians were to clear the code from the control module and inform the customer that "a fix will be forthcoming." If the fuel pressure was below 58psi, technicians were directed to GM's proprietary SI system for diagnosis.

92.     In February 2020, GM published Service Bulletin 20-NA-027, which replaced the previous Preliminary Information. Applying to the same vehicles and regarding the same condition, now GM indicated that "[t]his condition may be caused by the ECM detecting higher than expected fuel tank pump pressure." Again, technicians were directed to check fuel pump pressure at idle. If the pressure was higher than 58 psi, technicians were to reprogram the ECM with the latest calibration. If the fuel pressure is below 58 psi, technicians were directed to GM's propriety SI system for diagnosis.

---

[2] This bulletin also applies to the 2020 Holden Terrain, which is a vehicle sold in Australia.

93.     In June 2021, GM published Preliminary PIP5496C, applicable to 2018-2020 Chevrolet Equinox and 2018-2020 GMC Terrain vehicles. GM warned that consumers may complain that the fuel tank was hard to fill or that the DTC P0446 was set (fuel tank pressure sensor). The cause was listed as the vent hose becoming disconnected from the fuel pump. Technicians were directed to reconnect the fuel vent hose to the fuel pump, but the information to report this as a repair to GM under the emission warranty was a "fuel pump module replacement."

94.     In October 2021, GM recalled fuel pump control modules in 2021 Cadillac Escalade, 2021 Chevrolet Suburban and Tahoe, and 2021 GMC Yukon vehicles. GM noted that the modules "may contain a supplier manufacturing defect that can cause the fuel pump to fail or operate intermittently, interrupting the flow of fuel to the engine." GM also listed the safety hazards of this manufacturing defect: "the vehicle may unexpectedly stall," the driver may "experience a rough running engine," "[t]he vehicle may also be placed into reduced power mode." GM warned "[a] vehicle stall without warning could increase the risk of a crash, especially at high speeds."  As such, GM was well aware of the safety risk of failing fuel pump control modules.

95.     In February 2023, GM issued a recall of 23,164 vehicles, including 2021-2022 Chevrolet Equinox and 2022 GMC Terrain for defective fuel pump control modules. Per the chronology submitted to NHTSA regarding the recall, GM opened an investigation on August 23, 2022 "based on a high rate of warranty returns for the fuel tank pump" on 2021-2022 Chevrolet Equinox and GMC Terrain vehicles.  That investigation involved analyzing field data and returned components, as well as an inspection of the supplier's facility and manufacturing processes.  On December 20, 2022, the supplier informed GM that "its manufacturing team made an unauthorized change in the fuel tank pump rolling force on May 2, 2021." The problem was discovered and

corrected on June 1, 2021. GM identified 710 stall events "potentially related to the recall condition" over an 18-month period before deciding to conduct the recall on January 12, 2023.

96.     Despite the bulletins and recall, the Class Vehicles continue to experience high rates of premature fuel pump failure. These include both Class Vehicles who received component replacements via the recall and Class Vehicles which were not included in the recall despite the safety risk posed to Plaintiffs, Class Members and the general public.

97.     In addition to GM's own internal testing, investigation and knowledge of the Defect, customers complained on the NHTSA's website.

98.     Federal law requires automakers like GM to be in close contact with NHTSA regarding potential auto defects, including imposing a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. See TREAD Act, Pub. L. No. 106-414, 114 Stat.1800 (2000).

99.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id*. Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety-related. *Id*.

100.    Consumers may file vehicle safety-related complaints through the NHTSA website, where they are logged and published. The customer complaints are easily sorted by make, model, and year of vehicle. Based on the legal obligations discussed above, GM and/or GM personnel would review NHTSA's website for complaints. Thus, GM knew or should have known of the many complaints about the Defect logged by NHTSA ODI. The content, consistency, and

disproportionate number of those complaints alerted, or should have alerted, GM to the Defect in as early as 2020. With respect solely to the Class Vehicles, attached hereto as **Exhibit A,** is a sampling of these complaints filed with the NHTSA for the Class Vehicles, which are available on the NHTSA's website, www.safercar.gov. These excerpts of customer complaints are but a few examples of the many complaints concerning the Defect. Many of the complaints reveal that GM, through its network of dealers and repair technicians, had been made aware of the Defect. In addition, the complaints indicate that despite having knowledge of the Defect and even armed with knowledge of the exact vehicles affected, GM often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under warranty.

101.    Consumers have also posted extensively on websites dedicated to discussions of GM vehicles regarding the Defect in Class Vehicles. GM has made the monitoring of consumer complaints as posted on third-party websites a part of their brand and reputational management for at least a decade.[3] Attached hereto as **Exhibit B** is a sampling of those complaints, indicating that the recall was too narrow and that vehicles produced after the recall still contain the Defect.

      **E.**     **Fraudulent Concealment Allegations**

102.    Absent discovery, Plaintiffs are unaware of, and unable through reasonable investigation to obtain, the true names and identities of those individuals at GM responsible for disseminating false and misleading marketing materials and information regarding the Class Vehicles. GM necessarily is in possession of or has access to all of this information.

---

[3] Read, Richard, "Taking your car complaint online? Chrysler, GM, and Ford will see it.", *Christian Science Monitor*, Aug. 21, 2012 (available at https://www.csmonitor.com/Business/In-Gear/2012/0827/Taking-your-car-complaint-online-Chrysler-GM-and-Ford-will-see-it.    (last visited December 10, 2021)

103.     Plaintiffs' claims arise out of GM's fraudulent concealment of the Defect and the problems it causes, and its representations about the quality, durability, and performance of the Class Vehicles, including their Engines.

104.     To the extent that Plaintiffs' claims arise from GM's fraudulent concealment, there is no one document or communication, and no one interaction, upon which Plaintiffs base their claims.  Plaintiffs allege that at all relevant times, including specifically at the time they purchased or leased their Class Vehicles, GM knew, or was reckless in not knowing, of the Defect; GM was under a duty to disclose the Defect based upon its exclusive knowledge of it, its affirmative representations about it, and its concealment of it, and GM never disclosed the Defect to Plaintiffs or the public at any time or place or in any manner.

105.     Plaintiffs make the following specific fraud allegations with as much specificity as possible, although they do not have access to information necessarily available only to GM:

a.     ***Who***: GM actively concealed the Defect from Plaintiffs and Class members while simultaneously touting the quality, durability and performance of the Class Vehicles and their fuel pumps and fuel pump modules.  Plaintiffs are unaware of, and therefore unable to identify, the true names and identities of those specific individuals at GM responsible for such decisions.

b.     ***What***: GM knew, or was reckless or negligent in not knowing, that the Class Vehicles suffer from the Defect. GM concealed the Defect and made contrary representations about the quality, durability, performance, and other attributes of the Class Vehicles.

c.     ***When***: GM concealed material information regarding the Defect at all times and made representations about the quality, durability, and performance of

the Class Vehicles, starting no later than 2013, or at the subsequent introduction of certain models of Class Vehicles to the market, continuing through the time of sale/lease, and on an ongoing basis, and continuing to this day. GM has not disclosed the truth about the Defect in the Class Vehicles to anyone outside of GM. GM has never taken any action to inform consumers about the true nature of the Defect in Class Vehicles.  And when consumers brought their Class Vehicles to GM complaining of the symptoms associated with the Defect, GM denied any knowledge of, or responsibility for, the Defect.

d.      ***Where***:  GM concealed material information regarding the true nature of the Defect in every communication it had with Plaintiffs and Class members and made contrary representations about the quality, durability, and performance of the Class Vehicles and their fuel pumps and fuel pump modules.  Plaintiffs are aware of no document, communication, or other place or thing in which GM disclosed the truth about the Defect in the Class Vehicles to anyone outside of GM. Such information is not adequately disclosed in any sales documents, displays, advertisements, warranties, owner's manual, or on GM's website.

e.      ***How***: GM concealed the Defect from Plaintiffs and Class members and made representations about the quality and durability of the Class Vehicles. GM actively concealed the truth about the existence and nature of the Defect from Plaintiffs and Class members at all times, even though it knew about the Defect and knew that information about the Defect would be important

to a reasonable consumer, and GM promised in its marketing materials that the Class Vehicles have qualities that they do not have, and moreover, made representations in its warranties that it knew were false, misleading, and deceptive.

f.   ***Why***: GM actively concealed material information about the Defect in Class Vehicles, and simultaneously made representations about the quality, durability, and performance of the Class Vehicles and their fuel pump and fuel pump modules, for the purpose of inducing Plaintiffs and Class members to purchase or lease the Class Vehicles, rather than purchasing or leasing competitors' vehicles.  Had GM disclosed the truth, for example, in its advertisements or other materials or communications, Plaintiffs (and reasonable consumers) would have been aware of the Defect, and would not have bought the Class Vehicles or would have paid less for them.

**F.   GM Has Actively Concealed the Defect**

106.   Despite its knowledge of the Defect in the Class Vehicles, Defendant actively concealed the existence and nature of the Defect from Plaintiffs and Class Members. Specifically, Defendant failed to disclose to or actively concealed from Plaintiffs and Class Members, at and after the time of purchase, lease, or repair, and thereafter:

a.   any and all known material defects or material nonconformities of the Class Vehicles, including the Defect;

b.   that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and

c.   that the Class Vehicles were defective, even though GM learned of the Defect before it placed the Class Vehicles in the stream of commerce.

107.    More troubling, Defendant did not issue a recall for all Class Vehicles and otherwise refuses to acknowledge the Defect, despite drafting a bulletin in 2019 about the issues. The bulletins cited above were never released to the public, despite the numerous repairs and reports of symptoms.  GM also refuses to acknowledge ongoing complaints made as a result of the Defect, even as a vehicle has been repaired and certain rocker arms and related parts and components were replaced.  Indeed, GM has refused to honor its warranty or admit the existence of the Defect after these repairs have taken place.

108.    Further, GM supposedly re-designed the fuel pump and/or fuel pump modules to attempt to remedy the Defect, but did not notify current owners or lessees of the re-design or encourage replacement of components with the re-designed parts.

109.     GM has also directed its authorized dealerships to inform Plaintiffs and members of the Class that that no repairs are necessary or that driving in this condition is fine, so consumers will delay repairs until after the warranty period has expired.  In this way, GM unfairly transfers the cost of repair to Plaintiffs and Class Members and reduces its own recall and warranty costs.

110.    Defendant has deprived Class Members of the benefit of their bargain, exposed them all to a dangerous safety Defect, and caused them to expend money at their dealerships and/or be unable to drive their vehicles for long stretches of time, while they are being constantly repaired.

111.    Moreover, when vehicles are brought to Defendant's dealers for repair, whether covered by warranty or not, Class Members are provided with ineffective repairs in which defective parts are replaced with other defective parts, as experienced by Plaintiffs.

112.    As a result, Class Members continue to experience the Defect despite having repairs, as shown by the experiences of Plaintiffs. Because many Class Members, like Plaintiffs, are current owners or lessees who rely on their vehicles on a daily basis, compensation for repairs,

related expenses (e.g. towing), and diminution in value is not sufficient. A remedial scheme which also makes available a fix and/or warranty extension is necessary to make Class Members whole.

113.   Defendant has not recalled all the Class Vehicles to repair the Defect, has not offered to its customers a free suitable repair or free replacement of parts related to the Defect, under the recall or otherwise, and has not reimbursed all Class Vehicle owners and leaseholders who incurred costs for repairs related to the Defect.

114.   Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

115.   As a result of the Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

116.   The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Whether a vehicle's fuel pump is defective, resulting in unexpected loss of motive power, engine jerking, stalling, and/or failing to accelerate, the risk of collision is drastically increased due to the consumer's inability to maintain steering, braking, and speed control, thereby putting consumers, passengers, and bystanders in danger, is a material safety concern. Had Plaintiffs and other Class Members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

117.   Reasonable consumers, like Plaintiffs, expect that a vehicle is safe, will function in a manner that will not pose a safety risk, is free from defects, and will not malfunction while operating the vehicle as it is intended. Plaintiffs and Class Members further expect and assume that GM will not sell or lease vehicles with known safety defects, such as the Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.

118.    The Class Vehicles do not function as GM intended; no manufacturer intends for a vehicle's engine components to premature fail, resulting to decreased engine performance, loss of power, and eventual catastrophic engine failure.

**G.    GM Has Unjustly Retained a Substantial Benefit**

119.    Plaintiffs allege that Defendant unlawfully failed to disclose the alleged Defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

120.    Plaintiffs further allege that Defendant, thus, engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles.

121.    As discussed above, therefore, Plaintiffs allege that Defendant unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the Defect.

122.    For each year the Class Vehicles were available for sale, GM has earned over $122 billion in revenue, partially attributable to these vehicle sales and part sales for repairs for the Defect.  In 2019, GM earned $137.24 billion; in 2020, $122.49 billion; in 2021, $127 billion; in 2022, $156.74 billion; and in 2023, $171.84 billion.

123.    Accordingly, Defendant's ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

**H.    The Relationship Between GM US, LLC and its Network of
     Authorized Dealerships related to GM's Warranties**

124.    In order to sell vehicles to the general public, Defendant enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, Defendant-branded vehicles, the

authorized dealerships are also permitted under these agreements with Defendant to service and repair these vehicles under the warranties Defendant provides directly to consumers who purchased new vehicles from the authorized dealerships.

125.    Accordingly, Defendant's authorized dealerships are Defendant's agents, and the consumers who purchase or lease Defendant vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their Defendant vehicles locally. Because Plaintiffs and members of the Class there are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between other parties that create an implied warranty of merchantability may avail themselves of the implied warranty. *See In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1185 (C.D. Cal. 2010).

126.    Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of Defendant's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by Defendant. Defendant's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of Defendant's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

127.    Defendant issued the express warranty to the Plaintiffs and the Class members. Defendant also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. Defendant also is responsible for the content of the Monroney Stickers on Defendant-branded vehicles. Because

Defendant issues the express warranty directly to the consumers, the consumers are in direct privity with Defendant with respect to the warranties.

128.    In promoting, selling, and repairing its defective vehicles, Defendant acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive Defendant representatives and agents. That the dealers act as Defendant's agents is demonstrated by the following facts:

a.    The authorized GM US LLC dealerships complete all service and repair according to Defendant's instructions, which Defendant issues to its authorized dealerships through service manuals, service bulletins, TSBs, SI diagnosis, and other documents;

b.    Consumers are able to receive services under Defendant's issued New Vehicle Limited Warranty only at Defendant's authorized dealerships, and they are able to receive these services because of the agreements between Defendant and the authorized dealers. These agreements provide Defendant with a significant amount of control over the actions of the authorized dealerships;

c.    The warranties provided by Defendant for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

d.    Defendant has provided training and partnered with various technical schools to provide GM-specific training for technicians, so that dealerships are able to hire technicians that have completed GM-overseen certification course;

e.    Defendant dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

f.    Defendant controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, and the dealerships are able to perform

repairs under warranty only with Defendant's authorization;

g.      Defendant has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public; and

h.      Defendant implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized Defendant dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

129.    Indeed, GM's warranty booklets make it abundantly clear that GM's authorized dealerships are GM's agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at its "authorized dealerships."

130.    For example, at the outset, GM notifies Plaintiffs and class members in the warranty booklet that "**The dealer is best equipped to provide all your vehicle's service needs,**" and that "**To obtain warranty repairs, take the vehicle to a Chevrolet dealer facility within the warranty period and request the needed repairs.**" The booklets direct Plaintiffs and Class Members, should they have a problem or concern "that is not resolved during or after the limited warranty period, talk to a member of dealer management."[4]

131.    GM's Certified Pre-Owned vehicle program also relies on the authorized dealerships performing a 172-point inspection process before the vehicles can be "certified" and offered for sale.  The dealerships perform this certification process, signing the paperwork which then obligates GM to provide a 100,000 mile, 6 year, whichever comes first, powertrain warranty

---

[4]    *See e.g.*, Chevrolet Owners – Warranty Information, available at https://www.chevrolet.com/content/dam/chevrolet/na/us/english/index/owners/warranty/02-pdfs/21_CHEV_WM_en_US_U_84266998C_2020JUL17_3P.pdf

to whomever purchases the vehicle.[5]   These factory-backed warranties are provided on the authorization of dealership personnel.

132.    Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of Defendant. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either Defendant or its agent dealerships to establish privity of contract between Defendant, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and Defendant.

## IV.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Fraudulent Concealment

133.    As previously described, any applicable statute(s) of limitations has been tolled by GM's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the nature of the Defect prior to this class action litigation being commenced.

134.    GM was and remains under the continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of the Class Vehicles, and it will require costly repairs, poses a safety concern, and diminished the resale value of the Class Vehicles. As a result of the active concealment by GM, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

135.    GM has known of the Defect in the Class Vehicles since at least 2019, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Defect, even when directly asked about it by Plaintiffs and Class members

---

[5] *See*, https://www.gmcertified.com/certified-vs-used

during communications with GM, GM Customer Assistance, GM dealerships, and GM service centers.  GM continues to conceal the Defect to this day.

**B.     Estoppel**

136.    GM was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles.  GM actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles.  Plaintiffs and Class members reasonably relied upon GM's knowing and affirmative representations and/or active concealment of these facts.  Based on the foregoing, GM is estopped from relying on any statutes of limitation in defense of this action.

**C.     Discovery Rule**

137.    The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles suffered from the Defect.

138.    However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Defect caused their Engines and/or component parts failed.

139.    Even then, Plaintiffs and Class members had no reason to know that such failures, or the pre-failure symptoms described above, were caused by a defect in the Class Vehicles because of GM's active concealment of the Defect.  Not only did GM fail to notify Plaintiffs or Class members about the Defect, GM, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it.

140.    Thus, Plaintiffs and Class members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence,

and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing fuel pump failure in the engines of their Vehicles.

## V.      CLASS ALLEGATIONS

141.    Plaintiffs bring this action pursuant to Rule 23(a), 23(b)(2) and 23 (b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and as the following proposed classes:

**Nationwide Class:**

All persons or entities in the United States (including its territories and the District of Columbia) that purchased or leased a Class Vehicle.

**Florida Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within Florida.

**Texas Sub-Class:**

All persons or entities that purchased or leased a Class Vehicle within Texas.

142.    Excluded from the Class are Defendant; its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Defendant; Defendant's dealers; Class Counsel and their employees; the judicial officers and their immediate family members and associated court staff assigned to this case; and all persons within the third degree of relationship to any such persons.

143.    Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

144.    This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

145. **Numerosity**. Although the exact number of Class Members is uncertain and can only be ascertained through appropriate discovery, the number is great enough that such joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in GM's possession, custody, and/or control as well as from records kept by the Department of Motor Vehicles.

146. **Commonality and Predominance**. Rules 23(a)(2) and (b)(3) of the Federal Rules of Civil Procedure: This action involves common questions of law and fact, which predominate over any questions affecting individual Class members, including, but not limited to the following:

a. Whether Class Vehicles suffer from the Defect;

b. Whether GM engaged in the conduct alleged herein;

c. Whether the Defect constituted an unreasonable safety risk;

d. Whether the Defect constitutes a material fact;

e. Whether GM designed, manufactured, advertised, marketed, distributed, leased, sold, or otherwise placed Class Vehicles into the stream of commerce in the United States;

f. Whether GM designed, manufactured, marketed, and distributed Class Vehicles with the Defect;

g. Whether Defendant has a duty to disclose the defective nature of fuel pump to Plaintiffs and Class Members;

h. Whether Plaintiffs and Class members overpaid for their Class Vehicles and/or did not receive the benefit of the bargain;

i. Whether Defendant should be declared financially responsible for notifying all Class Members of the problems with the Class Vehicles and for the costs and expenses of repairing and replacing the defective fuel pump, fuel pump modules, and related components;

j. Whether Plaintiffs and Class members are entitled to damages and other monetary relief and, if so, in what amount;

k.  Whether GM's alleged conduct constitutes the use or employment of an unconscionable commercial practice, deception, fraud, false pretense, false promise, and misrepresentation within the meaning of the applicable state consumer fraud statutes;

l.  Whether GM has been unjustly enriched under applicable state laws;

m.  Whether GM has violated its express warranties to Plaintiffs and Class members;

n.  Whether Defendant breached the implied warranty or merchantability pursuant to the laws governing each of the Sub-Class jurisdictions;

o.  Whether GM violated the consumer protection acts of Florida and Texas;

p.  Whether GM actively concealed the Defect in order to maximize profits to the detriment of Plaintiffs and Class members; and

q.  Such other common factual and legal issues as are apparent from the allegations and causes of action asserted in this Complaint.

147.  **Typicality**.  Plaintiff's claims are typical of the claims of the Class and Sub-Classes in the Plaintiff, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by GM. The representative Plaintiff, like all Class Members, have been damaged by GM's misconduct in that they have incurred or will incur the cost of repairing or replacing the defective fuel pump. Rule 23(a)(3) of the Federal Rules of Civil Procedure: Plaintiff's claims are typical of the other Class members' claims because, among other things, all Class members were comparably injured through GM's wrongful conduct as described above.  All claims seek recovery on the same legal theories and are based upon GM's common course of conduct.

148.  **Adequacy**.  Plaintiffs will fairly and adequately protect the interests of the Class members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to prosecute this action

vigorously. The Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

149.     **Declaratory Relief**.  Rule 23(b)(2) of the Federal Rules of Civil Procedure:  GM has acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

150.     **Superiority**.  Rule 23(b)(3) of the Federal Rules of Civil Procedure:  A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiffs and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against GM, so it would be impracticable for Class members to individually seek redress for GM's wrongful conduct.  Even if Class members could afford individual litigation, the court system could not.  Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system.  By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## VI.   CAUSES OF ACTION

### COUNT I
### Fraud by Omission or Fraudulent Concealment
### (On behalf of the Nationwide Class, or in the Alternative,
### on Behalf of all Sub-Classes against Defendant)

151.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 150 above as if fully set forth herein.

152.     Plaintiffs bring this cause of action on behalf of themselves and the Nationwide Class, or in the alternative, on behalf of each of the State Sub-Classes, against Defendant.

153.    GM knew that the Class Vehicles suffered from an inherent Defect, were defectively designed and/or manufactured and were not suitable for their intended use.

154.    Defendant concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

155.    Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

> a.   Defendant was in a superior position to know the true state of facts about the safety defect suffered by the Class Vehicles;
>
> b.   The omitted facts were material because they directly impact the safety of the Class Vehicles;
>
> c.   Defendant knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;
>
> d.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,
>
> e.   Defendant actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

156.    The facts concealed or not disclosed by Defendant to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendant's Class Vehicles or pay a lesser price for them. Whether a vehicle's fuel pump is defective, resulting in unexpected loss of motive power, engine jerking, stalling, and/or failing to accelerate, the risk of collision is drastically increased due to the consumer's inability to maintain steering, braking, and speed control, thereby putting consumers, passengers, and bystanders in danger, is a material safety concern. Had Plaintiffs and Class

Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

157.    Defendant concealed or failed to disclose the true nature of the design and/or manufacturing defects suffered by the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendant's omissions to their detriment. This detriment is evident from Plaintiff's and Class Members' purchase or lease of Defendant's defective Class Vehicles.

158.    Defendant continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendant continues to cover up and conceal the true nature of the problem today.

159.    As a direct and proximate result of Defendant's misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the Defective Vehicles and obtain restitution or (b) affirm their purchase or lease of the Defective Vehicles and recover damages.

160.    Defendant's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendant. Defendant's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

**COUNT II**
**Unjust Enrichment**
**(On Behalf of the Class, or, in the Alternative,**
**on Behalf of all Sub-Classes against Defendant)**

161.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 150 above as if fully set forth herein.

162.    Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendant.

163.    GM has received and retained a benefit from Plaintiffs and all Class Members and inequity has resulted.

164.    GM has benefitted from selling and leasing defective cars whose value was artificially inflated by GM's concealment of the Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

165.    As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, GM charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to GM's authorized distributors and dealers, which are in GM's control.

166.    All Class members conferred a benefit on GM.

167.    It is inequitable for GM to retain these benefits.

168.    Plaintiffs and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from GM's conduct.

169.    GM knowingly accepted the benefits of its unjust conduct.

170.    As a result of the Defendant's unjust enrichment, Plaintiffs and Class Members have suffered damages.

171.    Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

172.    Additionally, Plaintiffs seek injunctive relief to compel Defendant to offer, under warranty, remediation solutions that Defendant identifies. Plaintiffs also seek injunctive relief

enjoining Defendant from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendant from selling the Class Vehicles with the misleading information; compelling Defendant to provide Class members with a replacement components that do not suffer from the defects alleged herein; and/or compelling Defendant to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

**COUNT III**
**Violation of the Magnuson-Moss Warranty Act**
**(15 U.S.C. § 2301)**
**(On behalf of the Class, or in the Alternative, on Behalf**
**of all Sub-Classes or on behalf of themselves individually against Defendant)**

173.    Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 150 above as if fully set forth herein.

174.    Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes, or themselves individually, against Defendant.

175.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

176.    GM is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

177.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

178.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

179.    Defendant's implied warranty is an "implied warranty" within the meaning of 15 U.S.C. § 2301(7).

180.    Defendant's express warranty is a "written warranty" within the meaning of 15 U.S.C. §2301(6).

181.    Defendant breached the implied warranty and the express warranty by virtue of the above-described acts.

182.    Plaintiffs and the other Class Members notified Defendant of the breach within a reasonable time and/or were not required to do so. GM was also on notice of the Defect from, among other sources, the complaints and service requests it received from Class Members and its dealers.

183.    Defendant's breach of the implied warranty and express warranty deprived Plaintiffs and Class Members of the benefits of their bargains.

184.    Because Plaintiffs sand Class Members purchased their vehicles from an authorized GM dealership, they are in privity with Defendants.  Plaintiffs and the members of the Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Plaintiffs and the members of the Class, on the other hand.  Furthermore, GM provided warranties directly to Plaintiffs and the members of the Class and Plaintiffs and the members of the Class are the intended beneficiaries of GM's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

185.    Nonetheless, privity is not required here because Plaintiffs and the members of the Class are the intended third-party beneficiaries of contracts between GM and its dealerships. These contracts give the dealerships the right to sell GM brand vehicles, as well as service and perform warranty repairs on GM's behalf. Plaintiffs and the members of the Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships. Plaintiffs and the members of the Class also have the right to receive service and warranty work at dealerships located more conveniently to them than GM's headquarters.

186.    GM breached these warranties, as described in more detail above. Without limitation, the Class Vehicles suffer from a Defect that puts vehicle occupants' safety in jeopardy. The Class Vehicles share a common defect in that they are manufactured with defective materials and/or with poor workmanship. Contrary to GM 's representations about its vehicles, the Class Vehicles are defective in manufacture, materials and/or workmanship and are unsafe. The Class Vehicles share a common defect.

187.    Affording GM a reasonable opportunity to cure its breach of written warranties would be unnecessary and futile here. Indeed, GM has long been on notice of the claims of Plaintiffs and Class members and has refused to provide a remedy, instead placing the blame on customers or refusing to acknowledge the existence of the defect.

188.    At the time of sale or lease of each Class Vehicle, GM knew, should have known, or was reckless in not knowing of its misrepresentations and omissions concerning the Class Vehicles' Defect and inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the Defect. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to

an informal dispute resolution procedure and/or afford GM a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

189.    Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because GM is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Class Vehicles by retaining them.

190.    Plaintiffs provided notice to GM of their intent to pursue class claims under the MMWA via letter dated May 3, 2024.

191.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

192.    Plaintiffs, individually and on behalf of all members of the Class, seek all damages permitted by law, in an amount to be proven at trial.

**Claims on Behalf of the Florida Sub-Class**

<u>**COUNT IV**</u>
**Breach of Express Warranty**
**F.S.A. §§ 672.313 and 680.21**
**(On Behalf of the Florida Sub-Class against Defendant)**

193.    Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 150 as if fully set forth herein.

194.    Plaintiffs Greg and Twila Kerr ("Florida Plaintiffs") bring this count on behalf of themselves and the Florida Sub-Class against Defendant.

195.    GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

196.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

197.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

198.    The engines and fuel pumps were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

199.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Florida state law.

200.    GM's basic limited warranty provides in relevant part that the "warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period.

201.    According to GM, bumper-to-bumper warranty lasts for 36 months or 36,0000 miles, whichever occurs first.  The powertrain limited warranty lasts for 5 years or 60,000 miles, whichever occurs first.

202.    The Warranty formed the basis of the bargain that was reached when Florida Plaintiffs and other members of the Florida Sub-Class purchased or leased their Class Vehicles.

203.    GM breached the express warranty through the acts and omissions described above.

204.    Further, Florida Plaintiffs and members of the Florida Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to

inform Florida Plaintiffs and members of the Florida Sub-Class that the Class Vehicles were equipped with defective engines, fuel pumps, and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

205.    GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

206.    Because Florida Plaintiffs purchased their vehicle from an authorized GM dealership, they are in privity with Defendant.  Florida Plaintiffs and the members of the Florida Sub-Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Florida Plaintiffs and the members of the Florida Sub-Class, on the other hand. Furthermore, GM provided warranties directly to Florida Plaintiffs and the members of the Florida Sub-Class and Florida Plaintiffs and the members of the Florida Sub-Class are the intended beneficiaries of GM's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

207.    Nonetheless, privity is not required here because Florida Plaintiffs and the members of the Florida Sub-Class are the intended third-party beneficiaries of contracts between GM and its dealerships.  These contracts give the dealerships the right to sell GM brand vehicles, as well as service and perform warranty repairs on GM's behalf.  Florida Plaintiffs and the members of the Florida Sub-Class are the beneficiaries of these contracts, because they are the intended end-

consumers and users of the products GM distributes to its authorized dealerships.  Florida Plaintiffs and the members of the Florida Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than GM's headquarters.

208.   Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Florida Plaintiffs and the members of the Florida Sub-Class.  Among other things, Florida Plaintiffs and members of the Florida Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between GM and members of the Class.

209.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Florida Plaintiffs and the members of the Florida Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

210.   Florida Plaintiffs were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

211.     Nonetheless, Florida Plaintiffs provided notice to GM of the breach of express warranties when they repeatedly took their vehicle to an authorized GM dealership and requested warranty repairs.

212.     Florida Plaintiffs further provided notice to GM of their claims via letter dated May 3, 2024.

213.     As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Florida Plaintiffs and Florida Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

214.     As a result of GM's breach of the express warranty, Florida Plaintiffs and Florida Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT V
### Breach of the Implied Warranty of Merchantability
### F.S.A. §§ 672.314 and 680.212
### (On Behalf of the Florida Sub-Class against Defendant)

215.     Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 150 as if fully set forth herein.

216.     Florida Plaintiffs bring this count on behalf of themselves and the Florida Sub-Class against Defendant.

217.     GM is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

218.    With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

219.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code Ann. § 75-2A-103(1)(p).

220.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

221.    GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Florida Plaintiffs and members of the Florida Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiffs and members of the Florida Sub-Class, with no modification to the defective Class Vehicles.

222.    GM provided Florida Plaintiffs and members of the Florida Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

223.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

224.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Florida Plaintiffs

and Florida Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

225.    As a result of GM's breach of the applicable implied warranties, Florida Plaintiffs and members of the Florida Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Florida Plaintiffs and members of the Florida Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

226.    GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

227.    Florida Plaintiffs and members of the Florida Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

228.    Florida Plaintiffs and members of the Florida Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Florida Plaintiffs and the Class Members and through other internal sources.

229.    Nonetheless, Florida Plaintiffs provided notice to GM of the breach of implied warranties when they repeatedly took their vehicle to an authorized GM dealership and requested warranty repairs.

230.    Florida Plaintiffs further provided notice to GM of their claims via letter dated May 3, 2024.

231.    Because Florida Plaintiffs purchased their vehicle from an authorized GM dealership, they are in privity with Defendant.  Florida Plaintiffs and the members of the Florida Sub-Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Florida Plaintiffs and the members of the Florida Sub-Class, on the other hand.  Furthermore, GM provided warranties directly to Florida Plaintiffs and the members of the Florida Sub-Class and Florida Plaintiffs and the members of the Florida Sub-Class are the intended beneficiaries of GM's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

232.    Nonetheless, privity is not required here because Florida Plaintiffs and the members of the Florida Sub-Class are the intended third-party beneficiaries of contracts between GM and its dealerships.  These contracts give the dealerships the right to sell GM vehicles, as well as service and perform warranty repairs on GM's behalf.  Florida Plaintiffs and the members of the Florida Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.  Florida Plaintiffs and the members of the Florida Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than GM's headquarters.

233.    As a direct and proximate cause of GM's breach, Florida Plaintiffs and members of the Florida Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally,

Florida Plaintiffs and members of the Florida Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

234.   As a direct and proximate result of GM's breach of the implied warranty of merchantability, Florida Plaintiffs and members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

**COUNT VI**
**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**F.S.A.  §§ 501.201-.213**
**(On Behalf of the Florida Sub-Class against Defendant)**

235.   Plaintiffs repeat and re-allege each and every allegation contained in paragraphs 1 through 150 above as if fully set forth herein.

236.   Florida Plaintiffs bring this cause of action on behalf of themselves and on behalf of the members of the Florida Sub-Class.

237.   GM's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, *et seq*., ("FDUTPA").

238.   At all relevant times, Florida Plaintiffs and members of the Florida Sub-Class were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

239.   GM's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA F.S.A. § 501.203(8).

240.   FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." F.S.A. § 501.204.

241.   GM participated in unfair or deceptive trade practices that violated the FDUTPA. As described below and alleged throughout the Complaint, by failing to disclose the Defect, by

concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

242.   GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

243.   GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

244.   GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

245.   GM knew or should have known that its conduct violated the FDUTPA.

246.   Defendant was under a duty to Florida Plaintiffs and the Florida Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.   Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.   Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.   Defendant actively concealed the defective nature of the Class Vehicles from Florida Plaintiffs and the Florida Sub-Class Members at the time of sale and thereafter.

247.   By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

248.   The facts concealed or not disclosed by Defendant to Florida Plaintiffs and the Florida Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's fuel pump is defective, resulting in unexpected loss of motive power, engine jerking, stalling, and/or failing to accelerate, the risk of collision is drastically increased due to the consumer's inability to maintain steering, braking, and speed control, thereby putting consumers, passengers, and bystanders in danger, is a material safety concern. Had Florida Plaintiffs and the Florida Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

249.   Florida Plaintiffs and the Florida Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

250.   As a result of Defendant's misconduct, Florida Plaintiffs and the Florida Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

251.     As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Florida Plaintiffs and the Florida Sub-Class Members have suffered and will continue to suffer actual damages.

252.     GM's violations present a continuing risk to Florida Plaintiffs and the Florida Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

253.     The foregoing acts, omissions, and practices proximately caused Florida Plaintiffs and the Florida Sub-Class Members to suffer real damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution of value of the vehicles, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees, and costs of suit.

**Claims on Behalf of the Texas Sub-Class**

**COUNT VII**
**Breach of Express Warranty**
**Tex. Bus. & Com. Code §§ 2.313 and 2A.210**
**(On Behalf of the Texas Sub-Class against Defendant)**

254.     Plaintiffs repeat and re-allege each and every allegation contained above in paragraphs 1 through 150 as if fully set forth herein.

255.     Plaintiff Robert Knowles ("Texas Plaintiff") brings this count on behalf of himself and the Texas Sub-Class against Defendant.

256.     GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

257.     With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

258.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

259.    The engines and fuel pumps were manufactured and/or installed in the Class Vehicles by Defendant and are covered by the express warranty.

260.    Defendant provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, GM's express warranty is an express warranty under Texas state law.

261.    GM's basic limited warranty provides in relevant part that the "warranty covers repairs to correct any vehicle defect, not slight noise, vibrations, or other normal characteristics of the vehicle due to materials or workmanship occurring during the warranty period.

262.    According to GM, the bumper-to-bumper warranty lasts for 36 months or 36,0000 miles, whichever occurs first. The powertrain warranty lasts for five years or 60,000 miles, whichever occurs first.

263.    The Warranty formed the basis of the bargain that was reached when Texas Plaintiff and other members of the Texas Sub-Class purchased or leased their Class Vehicles.

264.    GM breached the express warranty through the acts and omissions described above.

265.    Further, Texas Plaintiff and members of the Texas Sub-Class experienced defects within the warranty period. Despite the existence of the warranties, Defendant failed to inform Texas Plaintiff and members of the Texas Sub-Class that the Class Vehicles were equipped with defective engines, fuel pumps, and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Defect.

266.    GM breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendant and then failing to do so. Defendant has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

267.    Because Texas Plaintiff purchased his vehicle from an authorized GM dealership, he is in privity with Defendant.  Texas Plaintiff and the members of the Texas Sub-Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Texas Plaintiff and the members of the Texas Sub-Class, on the other hand.  Furthermore, GM provided warranties directly to Texas Plaintiff and the members of the Texas Sub-Class and Texas Plaintiff and the members of the Texas Sub-Class are the intended beneficiaries of GM's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

268.    Nonetheless, privity is not required here because Texas Plaintiff and the members of the Texas Sub-Class are the intended third-party beneficiaries of contracts between GM and its dealerships.  These contracts give the dealerships the right to sell GM brand vehicles, as well as service and perform warranty repairs on GM's behalf. Texas Plaintiff and the members of the Texas Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.  Texas Plaintiff and the members of the Texas Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than GM's headquarters.

269.     Any attempt by GM to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because GM knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect Texas Plaintiff and the members of the Texas Sub-Class. Among other things, Texas Plaintiff and members of the Texas Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by GM and unreasonable favored GM. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between GM and members of the Class.

270.     Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Texas Plaintiff and the members of the Texas Sub-Class whole, because GM has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

271.     Texas Plaintiff was not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of written warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

272.     Nonetheless, Texas Plaintiff provided notice to GM of the breach of express warranties when he repeatedly took his vehicle to an authorized GM dealership and requested warranty repairs.

273.   Texas Plaintiff further provided notice to GM of his claims via letter dated May 3, 2024.

274.   As a result of GM's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Texas Plaintiff and Texas Sub-Class Members were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

275.   As a result of GM's breach of the express warranty, Texas Plaintiff and Texas Sub-Class Members are entitled to legal and equitable relief against GM, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT VIII
**Breach of the Implied Warranty of Merchantability**
**Tex. Bus. & Com. Code. §§ 2.314 and 2A.212**
**(On Behalf of the Texas Sub-Class against Defendant)**

276.   Plaintiff repeats and re-allege each and every allegation contained in paragraphs 1 through 150 as if fully set forth herein.

277.   Texas Plaintiff brings this count on behalf of himself and the Texas Sub-Class against Defendant.

278.   GM is and was at all relevant times a "merchant" with respect to motor vehicles under Texas Bus. & Com. Code §§ 2.104(1) and 2A.103(a)(20), and a "seller" of motor vehicles under § 2.103(a)(4).

279.   With respect to leases, GM is and was at all relevant times a "lessor" of motor vehicles under Texas Bus. & Com. Code § 2A.103(a)(16).

280.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Texas Bus. & Com. Code §§ 2.105(a) and 2A.103(a)(8).

281.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Texas Bus. & Com. Code §§ 2.314 and 2A.212.

282.    GM knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. GM directly sold and marketed Class Vehicles to customers through authorized dealers in Texas and knew that the vehicles would likely be resold in Texas, like those from whom Texas Plaintiff and members of the Texas Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. GM knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Texas Plaintiff and members of the Texas Sub-Class, with no modification to the defective Class Vehicles.

283.    GM provided Texas Plaintiff and members of the Texas Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.

284.    This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by GM were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

285.    Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Texas Plaintiff and Texas Sub-Class Members with reliable, durable, and safe transportation. Instead, the Class

Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. GM knew of this defect at the time these sale or lease transactions occurred.

286.   As a result of GM's breach of the applicable implied warranties, Texas Plaintiff and members of the Texas Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Texas Plaintiff and members of the Texas Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

287.   GM's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

288.   Texas Plaintiff and members of the Texas Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of GM's conduct described herein.

289.   Texas Plaintiff and members of the Texas Sub-Class were not required to notify GM of the breach because affording GM a reasonable opportunity to cure its breach of warranty would have been futile. GM was also on notice of the Defect from the complaints and service requests it received from Texas Plaintiff and the Class Members and through other internal sources.

290.   Nonetheless, Texas Plaintiff provided notice to GM of the breach of implied warranties when he repeatedly took his vehicle to an authorized GM dealership and requested warranty repairs.

291.   Texas Plaintiff further provided notice to GM of his claims via letter dated May 3, 2024.

292.     Because Texas Plaintiff purchased his vehicle from an authorized GM dealership, he is in privity with Defendant.  Texas Plaintiff and the members of the Texas Sub-Class have had sufficient direct dealings with GM and its agents (dealerships and customer support personnel) to establish privity of contract between GM, on one hand, and Texas Plaintiff and the members of the Texas Sub-Class, on the other hand.  Furthermore, GM provided warranties directly to Texas Plaintiff and the members of the Texas Sub-Class and Texas Plaintiff and the members of the Texas Sub-Class are the intended beneficiaries of GM's express and implied warranties.  The dealers were not intended to be the ultimate consumers of their vehicles and have no rights under the warranty agreements provided with provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

293.     Nonetheless, privity is not required here because Texas Plaintiff and the members of the Texas Sub-Class are the intended third-party beneficiaries of contracts between GM and its dealerships.  These contracts give the dealerships the right to sell GM vehicles, as well as service and perform warranty repairs on GM's behalf.  Texas Plaintiff and the members of the Texas Sub-Class are the beneficiaries of these contracts, because they are the intended end-consumers and users of the products GM distributes to its authorized dealerships.  Texas Plaintiff and the members of the Texas Sub-Class also have the right to receive service and warranty work at dealerships located more conveniently to them than GM's headquarters.

294.     As a direct and proximate cause of GM's breach, Texas Plaintiff and members of the Texas Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Texas Plaintiff and members of the Texas Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

295.     As a direct and proximate result of GM's breach of the implied warranty of merchantability, Texas Plaintiff and members of the Texas Sub-Class have been damaged in an amount to be proven at trial.

## COUNT IX
### Violation of the Texas Deceptive Trade Practices Act-
### Consumer Protection Act
### Tex. Bus. & Com. Code § 17.41, *et. seq.*
### (On Behalf of the Texas Sub-Class against Defendant)

296.     Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 150 above as if fully set forth herein.

297.     Texas Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Texas Sub-Class.

298.     GM's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Texas Deceptive Trade Practices Act-Consumer Protection Act, § 17.41, et seq., ("Texas DTPA").

299.     GM is a "person" as that term is defined in Tex. Bus. & Com. Code § 17.45(3).

300.     Texas Plaintiffs and the members of the Texas Sub-Class are individuals, partnerships, or corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets), *see* Tex. Bus. & Com. Code § 17.41, and are therefore "consumers" pursuant to Tex. Bus. & Com. Code § 17.45(4).

301.     GM is engaged in "trade" or "commerce" or "consumer transactions" within the meaning Tex. Bus. & Com. Code § 17.46(a).

302.     The Texas Deceptive Trade Practices – Consumer Protection Act ("Texas DTPA") prohibits "false, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of

action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree." Tex. Bus. & Com. Code §§ 17.45(5) and 17.50(a)(3). GM engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Texas DTPA.

303.    GM participated in unfair or deceptive trade practices that violated the Texas DTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, GM knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. GM systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

304.    GM also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

305.    GM's unfair and deceptive acts or practices occurred repeatedly in GM's trade or business, were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

306.    GM knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

307.    GM knew or should have known that its conduct violated the Texas DTPA.

308.    Defendant was under a duty to Texas Plaintiff and the Texas Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.    Defendant was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.    Defendant made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

      c.    Defendant actively concealed the defective nature of the Class Vehicles from Texas Plaintiffs and the Texas Sub-Class Members at the time of sale and thereafter.

309.    By failing to disclose the Defect, Defendant knowingly and intentionally concealed material facts and breached its duty not to do so.

310.    The facts concealed or not disclosed by Defendant to Texas Plaintiff and the Texas Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendant's Class Vehicles, or to pay less for them. Whether a vehicle's fuel pump is defective, resulting in unexpected loss of motive power, engine jerking, stalling, and/or failing to accelerate, the risk of collision is drastically increased due to the consumer's inability to maintain steering, braking, and speed control, thereby putting consumers, passengers, and bystanders in danger, is a material safety concern. Had Texas Plaintiff and the Texas Sub-Class Members known that the Class Vehicles suffered from the Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

311.    Texas Plaintiff and the Texas Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

312.    As a result of Defendant's misconduct, Texas Plaintiff and the Texas Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

313.    As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Texas Plaintiff and the Texas Sub-Class Members have suffered and will continue to suffer actual damages.

314.    GM's violations present a continuing risk to Texas Plaintiff and the Texas Sub-Class Members as well as to the general public.  GM's unlawful acts and practices complained of herein affect the public interest.

315.    The foregoing acts, omissions, and practices proximately caused Texas Plaintiff and the Texas Sub-Class Members to suffer real damages in the form of, *inter alia*, overpaying for the vehicles, as well as diminution of value of the vehicles, and they are entitled to recover such damages, together with all other appropriate damages, attorneys' fees, and costs of suit.

## VIII. PRAYER FOR RELIEF

316. WHEREFORE, Plaintiffs, individually and on behalf of the members of the Nationwide and State Classes, respectfully request that the Court certify the proposed Nationwide and State Classes, including designating the named Plaintiffs as representatives of the Nationwide Class and their respective State Class and appointing the undersigned as Class Counsel, and the designation of any appropriate issue classes, under the applicable provisions of Fed. R. Civ. P. 23, and that the Court enter judgment in Plaintiffs' favor and against GM including the following relief:

317. A declaration that any applicable statutes of limitations are tolled due to GM's fraudulent concealment and that GM is estopped from relying on any statutes of limitations in defense;

i. Restitution, compensatory damages, and costs for economic loss and out-of- pocket costs;

ii. Punitive and exemplary damages under applicable law;

iii. Reimbursement and compensation of the full purchase price for any repairs or replacements purchased by Plaintiffs or Class member to remedy the Defect;

iv. A determination that GM is financially responsible for all Class notices and the administration of Class relief;

v. Any applicable statutory or civil penalties;

vi. An order requiring GM to pay both pre-judgment and post-judgment interest on any amounts awarded;

vii. An award of reasonable counsel fees, plus reimbursement of reasonable costs, expenses, and disbursements, including reasonable allowances for the fees of experts;

viii. Leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

ix. Any such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a jury trial on all issues so triable.

Dated:  May 15, 2024                           Respectfully submitted,

                                          Attorneys for Plaintiff,

                                          By: */s/Russell D. Paul*_____
                                          Russell D. Paul (Bar No. 4647)
                                          **BERGER MONTAGUE PC**
                                          800 N. West Street, Suite 200
                                          Wilmington, DE 19801
                                          Tel.:    (302) 691-9545
                                          Email:  rpaul@bm.net

                                          Abigail Gertner (PHV app. forthcoming)
                                          Amey J. Park (PHV app. forthcoming)
                                          Natalie Lesser (PHV app. forthcoming)
                                          **BERGER MONTAGUE PC**
                                          1818 Market Street, Suite 3600
                                          Philadelphia, PA 19103
                                          Tel.:    (215) 875-3000
                                          Fax:    (215) 875-4604
                                          Email: agertner@bm.net
                                                apark@bm.net
                                                nlesser@bm.net

                                          Tarek H. Zohdy (PHV app. forthcoming)
                                          Cody R. Padgett (PHV app. forthcoming)
                                          Laura E. Goolsby (PHV app. forthcoming)
                                          Nate N. Kiyam (PHV app. forthcoming)
                                          **CAPSTONE LAW APC**
                                          1875 Century Park East, Suite 1000
                                          Los Angeles, California 90067
                                          Telephone:    (310) 556-4811
                                          Facsimile:    (310) 943-0396
                                          Tarek.Zohdy@capstonelawyers.com
                                          Cody.Padgett@capstonelawyers.com
                                          Laura.Goolsby@capstonelawyers.com
                                          Nate.Kiyam@capstonelawyers.com