**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

GREG AND TWILA KERR, and ROBERT
KNOWLES, individually and on behalf of all
others similarly situated,

        Plaintiffs,

    v.

GENERAL MOTORS LLC,

        Defendant.

Civil Action No. 24-582-RGA

---

<u>MEMORANDUM OPINION</u>

Russell D. Paul, BERGER MONTAGUE PC, Wilmington, DE; Amey J. Park, Abigail J. Gertner, Natalie Lesser, BERGER MONTAGUE PC, Philadelphia, PA; Majdi Y. Hijazin, Cody R. Padgett, Nate N. Kiyam, CAPSTONE LAW APC, Los Angeles, CA,

    Attorneys for Plaintiffs.

Jody C. Barillare, MORGAN, LEWIS, & BOCKIUS LLP, Wilmington, DE; John Nadolenco, Daniel D. Queen, MAYER BROWN LLP, Los Angeles, CA,

    Attorneys for Defendant.

July 22, 2025

ANDREWS, U.S. DISTRICT JUDGE:

## I.    BACKGROUND[1]

Plaintiffs Robert Knowles ("Knowles"), a citizen of Texas (D.I. 1 ¶ 38), and Greg and

Twila Kerr, citizens of Florida (*id.* ¶ 23), filed a class action against General Motors ("GM") "on

behalf of all persons in the United States, and in the alternative on behalf of all persons in the states

of Texas and Florida, who purchased or leased any 2020–2024 Chevrolet Equinox or GMC Terrain

vehicles" (*id.* ¶ 1) ("Class Vehicles").   The class action alleges that the Class Vehicles were

equipped with a defective fuel pump (the "Defect"), and that GM

> manufactured, marketed, distributed, and sold the Class Vehicles without
> disclosing that [they] were being sold with a defect that materially affects the
> vehicles' ability to operate as intended and to provide safe and reliable
> transportation.  Instead, GM equipped these vehicles with a defective fuel pump
> and falsely marketed the vehicles as safe to drive, durable, and reliable.

(*Id.* ¶ 3).  The Complaint includes counts for fraud by omission or fraudulent concealment, unjust

enrichment, violation of the Magnuson-Moss Warranty Act ("MMWA"), breach of express

warranty, breach of the implied warranty of merchantability, and violations of the Florida

Deceptive and Unfair Trade Practices Act and Texas Deceptive Trade Practices Act.  (*Id.* ¶¶ 151–

315).

GM has simultaneously moved to compel arbitration of Knowles' claims (D.I. 30), to strike

the nationwide class allegations in the Complaint (D.I. 28), and to dismiss for failure to state a

claim (D.I. 26).  For the reasons set forth below, GM's motion to compel arbitration is DENIED;

---

[1] Jurisdiction is proper under the Class Action Fairness Act, *see* 28 U.S.C. § 1332(d)(2)(A), because "[a]t least one member of the proposed class is a citizen of a different state than GM, the number of proposed class members exceeds 100, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interests and costs."  (D.I. 1 ¶ 61).  I have supplemental jurisdiction over the state law claims.  *See* 28 U.S.C. § 1367.

its motion to strike the nationwide class allegations in the Complaint is DENIED; and its motion to dismiss the Complaint is GRANTED IN PART and DENIED IN PART.

## II.    LEGAL STANDARD

### A. Motion to Dismiss: Failure to State a Claim

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard. A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the Complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the Complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the Complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

Rule 9 adds a heightened pleading standard for allegations of fraud. It states, "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or

3

mistake." Fed. R. Civ. P. 9(b). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.* "To satisfy this standard, the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007). While courts have relaxed the requirements where the factual information is peculiarly within the defendant's knowledge or control, boilerplate and conclusory allegations will not suffice. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997). "Plaintiffs must accompany their legal theory with factual allegations that make their theoretically viable claim plausible." *Id.*

### B. Motion to Dismiss: Lack of Subject Matter Jurisdiction

Rule 12(b)(1) of the Federal Rules of Civil Procedure permits the dismissal of an action for "lack of subject matter jurisdiction." A Rule 12(b)(1) motion may be treated as either a facial or factual challenge to the court's subject matter jurisdiction. *Constitution Party v. Aichele*, 757 F.3d 347, 357–58 (3d Cir. 2014). "In reviewing a facial attack, 'the court must only consider the allegations of the complaint and documents referenced therein and attached thereto, in the light most favorable to the plaintiff.'" *Id.* at 358 (quoting *In re Schering Plough Corp.*, 678 F.3d 235, 243 (3d Cir. 2012)). In reviewing a factual attack, the court may consider evidence outside the pleadings. *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977).

## III.    DISCUSSION

I begin with GM's motion to compel arbitration of Knowles' claims, as the parties dispute whether I have the power to decide the merits of his claims. (D.I. 31 at 1, D.I. 38 at 1). Concluding that Knowles' claims should not go to arbitration, I then proceed to GM's motion to strike the

nationwide class allegations, which I deny. Finally, I address GM's motion to dismiss, which I grant in part and deny in part.

### A. GM's Motion to Compel Arbitration Is Denied.

I first address GM's motion to compel arbitration of Knowles' claims. (D.I. 30). Knowles purchased a 2023 GMC Terrain vehicle from a GM-authorized dealership named Bruner Motors in May of 2023. (D.I. 1 ¶ 39). When he bought his vehicle, Knowles signed a purchase agreement including an arbitration provision providing,

> **ARBITRATION PROVISION**
> . . .
> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. . . .

(D.I. 32-1 at 6 of 7). The agreement defines "us" as Bruner Motors and "you" as the purchaser. (*Id.* at 2 of 7). GM argues that it may compel Knowles to arbitrate under this agreement. (D.I. 31 at 1).

The parties dispute three issues: (1) whether it is proper for me to consider the arbitration agreement at all, given that it has not been authenticated; (2) whether the interpretation of the agreement itself is a question for the arbitrator, rather than for me; (3) if I do interpret the arbitration agreement, whether it mandates arbitration under these circumstances.

### 1. It Is Proper to Consider the Arbitration Agreement.

Knowles first argues, "GM Offers No Admissible Evidence that an Arbitration Agreement Exists." (D.I. 38 at 1). However, Knowles has since provided his own, identical, copy of the purchase agreement. (D.I. 44).

Under *Guidotti v. Legal Helpers Debt Resol., L.L.C*, when arbitrability is not apparent on the face of the complaint, as here, "the motion to compel arbitration must be denied pending further development of the factual record." 716 F.3d 764, 774 (3d Cir. 2013). "After limited discovery, the court may entertain a renewed motion to compel arbitration, this time judging the motion under a summary judgment standard." *Id.* at 776. However, "*Guidotti*'s mandate . . . assumes that the factual record needs to be developed. In [this] case, that is not so." *Young v. Experian Info. Sols., Inc.*, 119 F.4th 314, 320 (3d Cir. 2024). Because Knowles at no point disputes the existence or validity of the arbitration agreement, and has, in fact, provided his own, identical copy, I conclude that there is no genuine dispute of material fact as to the existence of the arbitration agreement, and proceed to the merits of the arbitration issue.

### 2. The Arbitrability of Knowles' Claims Is for the Court to Decide.

GM argues that because "[Knowles] agreed to arbitrate disputes regarding 'the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute[,]'" any challenge to the arbitrability of his claims is for the arbitrator to decide. (D.I. 31 at 6) (quoting D.I. 32-1 at 6 of 7). Considering the particular undisputed facts of this case, I disagree with GM.

The Federal Arbitration Act provides that arbitration agreements are "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court explained in *Henry Schein, Inc. v. Archer & White Sales, Inc.*:

> Under the Act, arbitration is a matter of contract, and courts must enforce arbitration contracts according to their terms. . . . [P]arties may agree to have an arbitrator decide not only the merits of a particular dispute but also 'gateway' questions of 'arbitrability,' such as whether the parties have agreed to arbitrate or whether their agreement covers a particular controversy.

586 U.S. 63, 67 (2019) (cleaned up).  If there is "clear and unmistakable" evidence that the parties

intended to delegate arbitrability, then "a court may not decide the arbitrability issue" and must

instead let the arbitrator decide.  *Id.* at 69 (citing *First Options of Chicago, Inc. v. Kaplan*, 514

U.S. 938, 944 (1995)).  Likewise, "questions about the 'making of the agreement to arbitrate' are

for the courts to decide unless the parties have clearly and unmistakably referred those issues to

arbitration in a written contract whose formation is not in issue." *Zirpoli v. Midland Funding,*

*LLC*, 48 F.4th 136, 140 (3d Cir. 2022) (quoting *MZM Constr. Co., Inc. v. N.J. Bldg. Labs.*

*Statewide Benefit Funds*, 974 F.3d 386, 392 (3d Cir. 2020)).  "[D]isputes are subject to arbitration

if, and only if, the parties actually agreed to arbitrate those disputes." *Coinbase, Inc. v. Suski*, 602

U.S. 143, 145 (2024).  In determining who is bound by an arbitration agreement, "background

principles of state contract law" apply. *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 630 (2009).

Here, applying basic principles of Texas contract law, I conclude that Knowles did not

agree to delegate the issue of arbitrability to an arbitrator in a dispute with a party not named in

the agreement.  Courts applying Texas law use a two-step test to "determine[] whether a valid

arbitration agreement exists. . . ." *Newman v. Plains All Am. Pipeline, L.P.*, 23 F.4th 393, 398 (5th

Cir. 2022) (citing *Henry Schein*, 586 U.S. at 69).  Under the first step, courts look to "the terms of

the agreement, which dictate who is actually bound by an arbitration agreement.  Then, if that fails,

[courts] look to theories such as equitable estoppel to determine whether a nonsignatory may

compel arbitration." *Id.* at 399 (cleaned up).  Both steps favor Knowles.

### a. The Terms of the Agreement Do Not Include GM.

Knowles succeeds at the first step of the *Newman* analysis.  Again, the arbitration

agreement provides,

> Any claim or dispute . . . between *you and us* or our employees, agents, successors
> or assigns, which arises out of or relates to your credit application, purchase or

7

> condition of this vehicle, this contract or any resulting transaction or relationship
> (including any such relationship with third parties who do not sign this contract)
> shall, at *your or our* election, be resolved by neutral, binding arbitration and not by
> a court action. . . .

(D.I. 32-1 at 6 of 7) (emphases added). The terms of the agreement could not more clearly "dictate

who is actually bound. . . ." *Newman*, 23 F.4th at 399. It defines "us" as Bruner Motors and "you"

as the purchaser. (D.I. 32-1 at 2 of 7). Under the plain language of the agreement, therefore,

Knowles agreed to delegate the issue of arbitrability in disputes with Bruner Motors and its

"agents, successors or assigns" *(id.* at 6 of 7)—none of whom are GM.

      Other courts analyzing identical or similar language have come to the same conclusion. In

*Ngo v. BMW of N. Am., LLC*, 23 F.4th 942, 948 (9th Cir. 2022), the Ninth Circuit found that an

arbitration clause identical to Knowles' could not be enforced by a non-signatory: "The arbitration

clause's enforcement provisions are limited to the dealership, the assignee, and [the plaintiff]. The

compelling inference from this arrangement is that the parties knew how to give enforcement

powers to non-signatories when they wished to do so but gave none to [the non-signatory]." The

*Ngo* court also considered another section of the purchase agreement—present in Knowles'

agreement as well—providing that it "does not affect any warranties covering the vehicle that the

vehicle manufacturer may provide" as a "potent indication that the parties knew how to deal with

claims against the manufacturer." *Id.*

      In *Kramer v. Toyota Motor Corp.*, the Ninth Circuit analyzed similar language and

concluded,

> The parties to this litigation did not agree to arbitrate arbitrability; Plaintiffs only
> agreed to arbitrate arbitrability—or any other dispute—with the Dealerships
> because the arbitration clause is limited to claims between "you and us"—i.e.
> Plaintiffs and the Dealerships. In the absence of a disagreement between Plaintiffs
> and the Dealerships, the agreement to arbitrate arbitrability does not apply.

8

705 F.3d 1122, 1127–28 (9th Cir. 2013). *See also GNH Grp., Inc. v. Guggenheim Holdings, L.L.C.*, 2020 WL 4287358, at *5 (D. Del. July 27, 2020) (collecting cases, including *Kramer*), *report and recommendation adopted*, 2020 WL 13679908 (D. Del. Aug. 19, 2020). Knowles, for his part, provides over a dozen cases in support of this view. (D.I. 38 at 7, 7 n.2, 14).

GM cites many cases in response. (D.I. 31 at 8 (collecting cases); D.I. 43 at 5–6). Three are most relevant. In *Hagenbaugh v. Nissan N. Am.*, 2023 WL 361786, at *4 (M.D. Pa. Jan. 23, 2023), the court analyzed language identical to the arbitration agreement here and found that there was a clear and unmistakable delegation—but that case relied heavily on the principle of equitable estoppel to determine that two non-signatories could enforce the arbitration agreement. *Id.* at 6–8. As I explain below, *see* Section III.A.2.b, *infra*, the same principle does not apply to this case. In its reply brief, GM identifies two other cases, *In re Chevrolet Bolt EV Battery Litig.*, 633 F. Supp. 3d 921, 949–52 (E.D. Mich. 2022) and *Harrison v. Gen. Motors LLC*, 651 F. Supp. 3d 878, 885–87 (E.D. Mich. 2023), that "appl[ied] the *exact same language* used in Knowles's agreement" (D.I. 43 at 5) and determined that arbitrability was for the arbitrator to decide. Both of those cases, however, followed controlling precedent in *Swiger v. Rosette*, 989 F.3d 501 (6th Cir. 2021), which established,

> [W]here a plaintiff has signed a contract with an arbitration provision and a delegation clause and where a non-party to the contract seeks to compel the plaintiff to arbitrate claims that bear some relation to the contract – the question is not whether the plaintiff specifically intended that the non-party could enforce the delegation clause. Rather, the sole question is whether the delegation clause clearly and unmistakably delegates questions of arbitrability to the arbitrator.

*Cunningham v. Ford Motor Co.*, 2022 WL 2819115, at *6 (E.D. Mich. July 19, 2022) (citing *Swiger*, 989 F.3d at 507). This approach is irreconcilable with the Fifth Circuit's determination in *Newman* that there is *no distinction* "between deciding whether an arbitration agreement exists . . . and deciding who it is enforceable against. . . ." *Newman*, 23 F.4th at 398. Indeed, the first step

under a *Newman* analysis—looking to the terms of the agreement to determine who is bound, *see id.* at 399—would be nonsense if any delegation clause immediately resolved the issue. The *Swiger* approach also runs counter to the Third Circuit's instruction in *Zirpoli* that courts must determine "if the *parties* . . . clearly and unmistakably expressed an agreement to arbitrate the issue of arbitrability," 48 F.4th 145 (emphasis added), rather than if the agreement contains an arbitrability provision at all. I therefore decline to follow the Sixth Circuit's approach in *Swiger*.

GM's other cases (D.I. 31 at 6–8) are also distinguishable. GM cites *Zirpoli* itself (*id.* at 6–7), in which the Third Circuit held that a non-signatory assignee to the rights under an arbitration agreement could compel the plaintiff to arbitrate. *Zirpoli*, 48 F.4th at 145. That case, however, rested on the conclusion that the plaintiff had explicitly agreed to delegate the issue of arbitrability in disputes with assignees:

> [The plaintiff] does not dispute that he signed an agreement in which he agreed to arbitrate claims not only with [the signatory] but also with [the signatory's] "past, present or future respective . . . assignees." [The non-signatory] *is* an assignee. Perhaps the assignment will later be invalidated as there is indeed a question as to the validity of the assignment, but not as to whether the agreement itself is valid. Accordingly, there exists here a valid agreement. One that [the plaintiff] signed, binding him to arbitrate claims with [the signatory] and its future assignee—[the non-signatory].

*Id.* at 142–43. Unlike the movant in *Zirpoli*, GM cannot plausibly argue that it is an assignee to the agreement. Further, *Robertson v. Enbridge (U.S.) Inc.*, 2020 WL 5754214, at *4 (W.D. Pa. July 31, 2020), *report and recommendation adopted*, 2020 WL 5702419 (W.D. Pa. Sept. 24, 2020) concerned language that, unlike the language in Knowles' agreement, did not explicitly limit delegation to conflicts between the signatories and their employees, agents, successors, or assignees. And unlike this case, *Eckert/Wordell Architects, Inc. v. FJM Properties of Willmar, LLC*, 756 F.3d 1098, 1100 (8th Cir. 2014) and *Brittania-U Nigeria, Ltd. v. Chevron USA, Inc.*, 866 F.3d 709, 714–16 (5th Cir. 2017) both concerned language that incorporated rules from the

American Arbitration Association and/or United Nations Commission on International Trade Law,

which the *Eckert/Wordell* and *Brittania-U* courts interpreted as clear and unmistakable delegations

of arbitrability. Where, as here, the language of the arbitration agreement specifies that it only

applies to the signatories and "employees, agents, successors or assigns" (D.I. 32-1 at 6 of 7)

thereof, and lacks any clear and unmistakable indication from the parties to this case of intent to

delegate arbitrability between them, I find that Knowles has the better of the argument.

### b. GM Cannot Avail Itself of Equitable Estoppel.

Step two of *Newman* requires "look[ing] to theories such as equitable estoppel to determine

whether a nonsignatory may compel arbitration." *Newman*, 23 F.4th at 399 (quotation omitted).

In this vein, GM argues that it is entitled to enforce Knowles' arbitration agreement under equitable

estoppel. (D.I. 31 at 10). I am not persuaded.

In Texas, equitable estoppel "precludes a party from claiming the benefits of a contract

while simultaneously attempting to avoid the burdens that contract imposes. . . ." *Van Zanten v.*

*Energy Transfer Partners, L.P.*, 320 S.W.3d 845, 848 (Tex. App. 2010) (quoting *Wash. Mut. Fin.*

*Group, LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004)). To that end, "a person who seeks by

his claim to derive a direct benefit from the contract containing the arbitration provision may be

equitably estopped from refusing arbitration." *Meyer v. WMCO-GP, LLC*, 211 S.W.3d 302, 305

(Tex. 2006) (cleaned up). Equitable estoppel may apply in two circumstances:

> First, . . . when the signatory to a written agreement containing an arbitration clause
> must rely on the terms of the written agreement in asserting its claims against the
> nonsignatory. . . . Second, . . . when the signatory to the contract containing an
> arbitration clause raises allegations of substantially interdependent and concerted
> misconduct by both the nonsignatory and one or more of the signatories to the
> contract.

*Id.* at 306. The first basis "applies where '(1) a nonsignatory has a close relationship with one of

the signatories and (2) the claims are intimately founded in and intertwined with the underlying

contract obligations.'" *Signal Ridge Owners Ass'n, Inc. v. Landmark Am. Ins. Co.*, 657 F. Supp. 3d 866, 876 (N.D. Tex. 2023) (quoting *Newman*, 23 F.4th at 404).[2]  Whether to utilize equitable estoppel is a decision within the Court's discretion. *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 528 (5th Cir. 2000).

There is no indication in the Complaint that Knowles is alleging concerted misconduct between Bruner Motors and GM, so the second basis for equitable estoppel is unavailable.

The first basis for equitable estoppel fares no better.

First, it is unlikely that Bruner Motors and GM have a "close relationship" under Texas law. A close relationship "generally require[es] formal corporate affiliation." *Newman*, 23 F.4th at 405. Further, the relationship "must be closer than merely independent participants in a business transaction." *Id.*  Instead, this test is more likely to be satisfied "when plaintiffs treat multiple defendants as a single unit in their pleadings, raising virtually indistinguishable factual allegations against them." *Id.* (cleaned up). When, as here, the plaintiffs do not even sue one of the two purported members of the relationship, that cuts against equitable estoppel. *See id.*

Second, it is unlikely that Knowles' claims are "intimately founded in and intertwined with the underlying contract obligations." *Signal Ridge*, 657 F. Supp. 3d at 876 (cleaned up). Importantly, it is not sufficient for the claims to merely "presume" the existence of the underlying contract, *Positive Software Sols., Inc. v. New Century Mortg. Corp.*, 259 F. Supp. 2d 531, 540 (N.D. Tex. 2003)—instead, the claims must "completely rely on the terms of [the] agreement. . . ."

---

[2] GM characterizes the relevant equitable estoppel doctrine under Texas law as applying in two circumstances: first, "where the claims against the non-signatory arise out of the agreement containing the arbitration clause"; and second, "where plaintiffs' claims against the non-signatories are 'intertwined' with the underlying contract and a signatory's conduct." (D.I. 31 at 11–12). Per the discussion in *Signal Ridge*, 657 F. Supp. 3d at 876, GM's second basis seems to be an elaboration on the first, rather than a distinct theory.

*Vinewood Cap., L.L.C. v. Al-Maal*, 2007 WL 2791876, at \*6 (N.D. Tex. Sept. 26, 2007), *aff'd sub nom. Vinewood Cap., LLC. v. Dar Al-Maal Al-Islami Tr.*, 295 F. App'x 726 (5th Cir. 2008). Nowhere in the Complaint does Knowles rely on the language of the agreement in stating his claims. (D.I. 1). He couldn't if he wanted to, says Knowles (D.I. 38 at 17), because the purchase agreement explicitly disclaims any warranties: "[T]he seller makes no warranties, express or implied, on the vehicle, and there will be no implied warranties of merchantability or of fitness for a particular purpose. This provision does not affect any warranties covering the vehicle that the vehicle manufacturer may provide." (D.I. 32-1 at 2 of 7). GM argues that Knowles' claims rely on the language of the purchase agreement, but at no point identifies the specific provisions or language on which Knowles relies to state a claim. (D.I. 31).

GM contests both prongs of the first basis for equitable estoppel, but its arguments are unpersuasive. With respect to its "close relationship" with Bruner Motors, GM argues,

> Knowles alleges that (a) he purchased his vehicle from a GM-authorized dealer, which acts as GM's agent for vehicle sales; (b) in doing so, he relied on the dealer's representations, which the dealers made on GM's behalf; (c) his GM dealer, acting as GM's agent for vehicle service issues, has failed to repair his vehicle under his warranty with GM; and (d) he thereby overpaid the dealer for his vehicle, unjustly enriching GM.

(D.I. 31 at 12) (citations omitted). None of these assertions establish that GM and Bruner Motors were anything other than "independent participants in a business transaction," *Newman*, 23 F.4th at 405, let alone that Knowles treated them as a "single unit," *id.* With respect to the claims' purported reliance on the terms of the arbitration agreement, GM argues, "According to Knowles, the warranty on his vehicle . . . 'formed the basis of the bargain that was reached' when he 'purchased his [vehicle].'" (D.I. 31 at 11) (cleaned up). This merely presumes the existence of the agreement—it does not "completely rely" on its terms in order to state a claim. *Vinewood*, 2007 WL 2791876, at \*6.

Contrasting *Hagenbaugh* and *Ngo* illustrates the point. Both of these cases relied on language identical to the arbitration agreement at issue here, but reached opposite conclusions when it came to the applicability of equitable estoppel. In *Hagenbaugh*, the plaintiffs explicitly sued manufacturers, alongside dealerships, for breach of the sales contracts between the plaintiffs and the dealerships. *Hagenbaugh*, 2023 WL 361786, at *6. The court approvingly cited excerpts from the manufacturers' briefs claiming that the plaintiffs had "lump[ed] the [d]ealerships and the [m]anufacturers together, claiming that 'Defendants' collectively committed all of the supposed wrongdoing." *Id.* at 7. The court then found that equitable estoppel applied. *Id.*

In *Ngo*, on the other hand, plaintiffs sued only the manufacturer. *Ngo*, 23 F.4th at 944. The plaintiff's claims did not allege breach of the purchase agreement. *Id.* at 945. Relying on California law providing that manufacturer warranties are not part of the purchase agreement, and the fact that "the purchase agreement expressly state[d] that it [did] not disturb any warranties provided by [the manufacturer]," the Ninth Circuit concluded that the manufacturer could not avail itself of equitable estoppel. *Id.* at 949. The court also noted, "To be sure, Ngo must show that she owned a BMW, but ownership does not entail an intention to enforce any obligations of the purchase agreement on BMW." *Id.*

Because Knowles has sued only GM, and for claims that in no way rely on the terms of his purchase agreement with Bruner Motors, I conclude that this case more closely resembles *Ngo* than it does *Hagenbaugh*. GM cannot avail itself of equitable estoppel.

In light of the above, I conclude that Knowles never agreed to arbitrate the arbitrability of this dispute with GM, nor can GM compel Knowles to do so via equitable estoppel.

### 3. The Arbitration Agreement Does Not Apply to this Dispute.

Because I conclude that GM is not a party to the arbitration agreement, and cannot enforce it through equitable estoppel, it necessarily follows that GM cannot use the agreement to compel arbitration. This is an unsurprising result: "deciding enforceability between the parties and an arbitration agreement's existence are two sides of the same coin." *Newman*, 23 F.4th at 398. GM's motion to compel arbitration of Knowles' claims is denied.

### B. GM's Motion to Strike the Nationwide Class Allegations Is Denied.

I next address GM's motion to strike the nationwide class allegations in the Complaint. (D.I. 28). GM's motion relies on two alternative arguments, both of which it maintains I should consider at the pleading stage: first, that Plaintiffs' nationwide claims cannot satisfy Rule 23; second, that Plaintiffs lack standing to assert state-law claims on behalf of a nationwide class for any state in which no Plaintiff purchased or leased a vehicle. (D.I. 29 at 2, 4, 11). I conclude that both issues should be deferred until class certification.

I begin with the Rule 23 argument. In *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154 (3d Cir. 2001), the Third Circuit noted, "A class certification decision requires a thorough examination of the factual and legal allegations. . . . For this purpose, it may be necessary for the court to probe behind the pleadings before coming to rest on the certification question." *Id.* at 165 (cleaned up). Therefore, "[i]t is only when no amount of discovery or time will allow for plaintiffs to resolve deficiencies in class definitions under Rule 23, that a motion to strike class allegations should be granted." *In re Paulsboro Derailment Cases*, 2014 WL 1371712, at *3 (D.N.J. Apr. 8, 2014).

GM argues that this standard is satisfied here, because Plaintiffs' nationwide class allegations would presumably be governed by the laws of all fifty states and D.C. (D.I. 29 at 4).

15

However, "choice-of-law issues in nationwide class actions are rarely so uncomplicated that one can delineate clear winning and losing arguments at an early stage in the litigation." *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 309 (3d Cir. 2011). Because discovery would aid in conducting the choice-of-law analysis by determining "the place where the conduct causing the injury occurred . . .; the residence and domicile of all class members; and []how various states' laws apply to the facts of Plaintiffs' claims" (D.I. 37 at 8), I decline to strike Plaintiffs' nationwide class allegations at this early stage on the basis of Rule 23.

Similarly, I decline to strike Plaintiffs' nationwide class allegations for lack of standing. "Recent authority in this District has come down on both sides of the issue" of when a court should decide whether plaintiffs have Article III standing to bring claims on behalf of unnamed class members who suffered injuries in states in which plaintiffs did not themselves suffer injuries. *Costa v. Whirlpool Corp.*, 2025 WL 885245, at *12 (D. Del. Mar. 21, 2025) (collecting cases). Some cases hold that Article III standing is a threshold matter that should be decided at the beginning of the case. *See, e.g., Diaz v. FCA US LLC*, 2022 WL 4016744, at *11 (D. Del. Sept. 2, 2022); *In re Sensipar (Cinacalcet Hydrochloride Tablets) Antitrust Litig.*, 2022 WL 736250, at *18 (D. Del. Mar. 11, 2022). Other cases hold that standing exists as long as the named plaintiffs can show injury, causation, and redressability; the issue of standing to represent the entire class can be postponed until class certification is decided. *See, e.g., Twardzik v. HP Inc.*, 2022 WL 606092, at *3 (D. Del. Jan. 25, 2022), *aff'd*, 2023 WL 5770999 (3d Cir. Sept. 7, 2023); *In re Seroquel XR (Extended Release Quetiapine Fumarate) Antitrust Litig.*, 2022 WL 2438934, at *15 (D. Del. July 5, 2022).

I choose to defer the question of standing. "I see no reason to wade through complex issues of jurisdiction and constitutional law when determinations of fact and interpretation of Rule 23

could well resolve the issue." *Seroquel*, 2022 WL 2438934, at *16; *Costa*, 2025 WL 885245, at *13 (same).  GM's motion to strike the nationwide class allegations is denied.

### C. GM's Motion to Dismiss Is Granted in Part and Denied in Part.

Finally, I address GM's motion to dismiss  (D.I. 26), which I grant as to Counts I–V and deny as to Counts VI–IX.

#### 1. Count III: Plaintiffs Have Not Satisfied MMWA Jurisdictional Requirements.

Count III is for violation of the MMWA.  (D.I. 1 ¶¶ 173–192).  The "MMWA requires at least 100 named plaintiffs to advance a class action claim under the Act." *Robinson v. Gen. Motors, LLC*, 2022 WL 19384806, at *4 (D. Del. Dec. 5, 2022) (citing 15 U.S.C. § 2310(d)).  Here, there are only three named plaintiffs.  (D.I. 1 ¶ 1).  Therefore, Plaintiffs have failed to satisfy the MMWA's jurisdictional requirements.  Plaintiffs argue that I have jurisdiction over their individual MMWA claims, either under the MMWA or via supplemental jurisdiction.  (D.I. 40 at 4–6).  The MMWA is of no help to Plaintiffs—Plaintiffs brought their action as a class action in federal court, and the MMWA provides that under those circumstances, "[n]o claim shall be cognizable" if "the number of named plaintiffs is less than one hundred."  15 U.S.C. § 2310(d)(3)–(d)(3)(C).  It does not distinguish between individual claims and those brought on behalf of a class.  *See Rains v. Jaguar Land Rover N. Am., LLC*, 2023 WL 6234411, at *3 (D.N.J. Sept. 26, 2023).  Supplemental jurisdiction does not work either: "Multiple courts in this Circuit have recently rejected [the argument that the Court can exercise supplemental jurisdiction over an MMWA claim]." *Costa*, 2025 WL 885245, at *13 (collecting cases).  GM's motion is granted as to the MMWA claim.

#### 2. Fraud-Based Counts (Counts I, VI, and IX): Count I Is Dismissed.

Counts I, VI, and IX of the Complaint allege fraud, violations of the Florida Deceptive and Unfair Trade Practices Act, and violations of the Texas Deceptive Trade Practices Act,

17

respectively. (D.I. 1 at 45, 60, and 71). Each of these counts is premised on the theory that GM knew or should have known that the Class Vehicles suffered from the Defect and sold them anyway. I dismiss Count I because it is barred under the economic loss doctrine. Plaintiffs' remaining claims survive, except to the extent Plaintiffs allege affirmative misrepresentation.

### a. Count I Is Barred by the Economic Loss Doctrine.

GM raises several arguments with respect to Count I: that the economic loss doctrine applies, that GM had no duty to disclose the relevant information, that Texas does not recognize a claim for fraudulent concealment, and that Plaintiffs failed to invoke the law of any particular jurisdiction. (D.I. 27 at 13–14). I find that the economic loss doctrine bars Count I, and I do not need to decide GM's remaining arguments.

The economic loss doctrine "prohibits recovery in tort of damages for purely economic loss unaccompanied by personal injury or property damage and that flow from a contract." (*Id.* at 13) (collecting cases). Plaintiffs do not contest that Count I would normally be covered by the economic loss doctrine—instead, they argue that they can avail themselves of an exception "to the [economic loss doctrine] where a party hides information about a defect or hides product safety concerns." (D.I. 40 at 13). That exception, however, applies to claims of fraudulent inducement, *see Tiara Condo. Ass'n v. Marsh & McLennan Cos,* 110 So. 3d 399, 406 (Fla. 2013), whereas Count I alleges fraudulent omission or concealment. (D.I. 1 ¶¶ 151–160). Many courts applying Florida or Texas law have found that fraudulent omission or concealment allegations do not constitute an exception to the economic loss doctrine. *See, e.g., Robinson v. Gen. Motors LLC,* 2021 WL 3036353, at *11 (D. Del. July 19, 2021), *report and recommendation adopted,* 2021 WL 7209365 (D. Del. Nov. 30, 2021) (applying Florida and Texas law, among others); *In re Subaru Battery Drain Prods. Liab. Litig.,* 2021 WL 1207791, at *29 (D.N.J. Mar. 31, 2021) ("[Florida and

18

other states] recognize[] an exception to the economic loss rule for affirmative fraudulent misrepresentations, but decline[] to apply the exception to claims of fraudulent concealment or omission such as those advanced here."); *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1339 (S.D. Fla. 2016) (applying Florida law, among others); *Ibe v. Jones*, 836 F.3d 516, 526 (5th Cir. 2016) (applying Texas law). Furthermore, fraudulent inducement, under Florida and Texas law, requires a material misrepresentation, which, as I discuss below, *see* Section III.C.2.c, *infra*, Plaintiffs have not alleged. *See Anderson v. Durant*, 550 S.W.3d 605, 614 (Tex. 2018); *Lorber v. Passick as Tr. of Sylvia Passick Revocable Tr.*, 327 So. 3d 297, 304 (Fla. Dist. Ct. App. 2021).

Plaintiffs respond by pointing to two cases from this District, *Bolton v. Ford Motor Co.*, 2024 WL 3328522, at *17 (D. Del. July 8, 2024) and *Petro v. FCA US LLC*, 2024 WL 3848433, at *7 (D. Del. Aug. 16, 2024), in which fraud-based claims survived the pleading stage despite the economic loss rule. (D.I. 40 at 13). Both cases are distinguishable.

*Bolton* relied on the exception for fraudulent inducement. *See Bolton*, 2024 WL 3328522, at *17 ("If the alleged fraud, however, relates to a misrepresentation which caused the plaintiff to enter into the agreement, then such fraud would be fraud in the inducement, which will not be barred by the economic loss rule.") (cleaned up). That exception does not apply here.

*Petro*, 2024 WL 3848433, at *7, relied on *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 448 (S.D.N.Y. 2017), *modified on reconsideration*, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017), which concluded that the economic loss doctrine did not preclude a Texas Deceptive Trade Practices Act claim, but explicitly declined to address "the question of whether the economic loss doctrine applies differently with respect to the [Texas Deceptive Trade

Practices Act] [] and common law fraud claims." *Id.* at 454 n.29.[3]  As I previously noted, courts

that have squarely addressed the applicability of the economic loss doctrine to common law fraud

claims have found that fraudulent omission or concealment claims do not constitute an exception.

I therefore find that Count I is barred by the economic loss doctrine, and it is dismissed.  Because

the economic loss doctrine bars Count I, further consideration of GM's additional arguments

concerning Count I is unnecessary.

### b.  Plaintiffs Adequately Allege Pre-Sale Knowledge.

GM argues that the Complaint fails to allege pre-sale knowledge sufficiently.  (D.I. 27 at

8).  I disagree.

Rule 9 adds a heightened pleading standard for allegations of fraud.  It states, "In alleging

fraud or mistake, a party must state with particularity the circumstances constituting fraud or

mistake."  Fed. R. Civ. P. 9(b).  "Malice, intent, knowledge, and other conditions of a person's

mind may be alleged generally."  *Id.*  Here, "the drivers need not establish that GM knew about

the starter defect.  Instead, they need only plausibly plead that. . . ." *Talley v. Gen. Motors, LLC*,

2021 WL 7209448, at *3 (D. Del. Nov. 26, 2021) (emphasis omitted).

The Complaint principally relies on three sources of information as indicative of GM's

knowledge of the Defect: service bulletins and recall notices (D.I. 1 ¶¶ 91–95); testing conducted

in the course of manufacturing the Class Vehicles (*id.* ¶ 90); and complaints to the National

Highway Traffic Safety Administration ("NHTSA")[4] (*id.* ¶¶ 97–100).  Taken together, the

---

[3] GM does not make its economic loss doctrine argument against Counts VI and IX, which rely on the Florida Unfair and Deceptive Trade Practices Act and the Texas Deceptive Trade Practices Act, respectively.

[4] Plaintiffs attached thirty-four of the complaints to their Complaint.  (D.I. 1-1).  The thirty-four are a "sampling."  (D.I. 1 ¶ 100).  I note that only two of them pre-date 2023, but I accept that they are a "sampling."  Based on the recall, I can infer that there are similar earlier complaints.

Complaint plausibly alleges that GM knew of the Defect when it sold the Class Vehicles to Plaintiffs.

Start with the service bulletins and recall notices. (*Id.* ¶¶ 91–95). The Complaint recounts Service Bulletins that, for one reason or another, noted "fuel pump low flow" (*id.* ¶ 91) or called for "fuel pump module replacement" (*id.* ¶ 93). Additionally, the Complaint alleges that in February of 2023, GM issued a recall "of 23,614 vehicles, including [the] 2021–2022 Chevrolet Equinox and 2022 GMC Terrain for defective fuel pump control modules." (*Id.* ¶ 95). The Complaint alleges that this recall was underinclusive, and that other Class Vehicles with the same fuel pumps and fuel pump control modules (*id.* ¶ 68, 69) "were not included in the recall" despite GM's knowledge of the safety risks those components posed (*id.* ¶ 96). This is enough to allow a reasonable inference of pre-sale knowledge.[5]

In response, GM argues that the recall and service bulletins were for "unrelated fuel-pump issues" (D.I. 27 at 8); that the recall did not cover the vehicles that Plaintiffs actually purchased; and that, in any event, the recall took place months after the Kerr Plaintiffs purchased their vehicle. (D.I. 27 at 8–10). On the first point: whether the recall and service bulletins were actually related to the Defect is a question for which an answer may present itself in discovery. On the limited record before me, it is impossible to say, and at this stage, I draw reasonable inferences in Plaintiffs' favor. Regardless, I am confident that Plaintiffs have not defined the Defect so broadly as to sweep up clearly unrelated evidence, as GM suggests. (*Id.* at 9) (citing *Diaz v. FCA US LLC*,

---

[5] The Complaint mentions a recall that GM issued in October of 2021 that pertained to fuel pump control modules in various 2021 vehicles, none of which included the Class Vehicles. (D.I. 1 ¶ 94). The Complaint does not allege that this recall bore any connection to the Defect; instead, it only alleges that as a result of the 2021 recall, "GM was well aware of the safety risk of failing fuel pump control modules." (*Id.*).

2022 WL 4016744, at *28). On the second point: it does not seem relevant to me that neither recall covered Plaintiffs' vehicles—they allege that the recall was underinclusive, and that other vehicles with the same fuel pump should have been included in the recall. That is enough. Recalls "issued for other vehicles can support a plausible inference of knowledge when the other vehicles had the same defective component as the vehicle at issue." *Browning v. Am. Honda Motor Co.*, 2022 WL 5287775, at *3 (N.D. Cal. Oct. 6, 2022) (citing *MacDonald v. Ford Motor Co.*, 37 F. Supp. 3d 1087, 1093–93 (N.D. Cal. 2014)).[6] On the third point: while the February 2023 recall issued after Plaintiffs purchased their vehicles, GM issued that recall after "identif[ying] 710 stall events . . . over an 18-month period before deciding to conduct the recall . . . ." (D.I. 1 ¶ 95). The Kerr Plaintiffs purchased their vehicle in October of 2022, just four months before the recall issued. (D.I. 1 ¶ 24). It is plausible that GM knew of the Defect before it issued the recall and before the Kerrs purchased their vehicle.

Because I conclude that the 2023 recall is sufficient evidence of pre-sale knowledge, a thorough discussion of Plaintiffs' remaining allegations on this point is unnecessary. Nevertheless, I briefly note that several courts have found sufficient evidence of pre-sale knowledge on facts similar to those alleged here. *See, e.g.*, *Bolton*, 2024 WL 3328522, at *11 ("When viewed together, the TSBs, NHTSA complaints, and testing allegations are adequate to establish pre-sale knowledge at this stage of the litigation."); *Talley*, 2021 WL 7209448, at *3 ("Taken together, [factual assertions that the defendant knew of a defect from results of preproduction tests, complaints on third-party websites, consumer complaints to the NHTSA, dealership reports, and demand for

---

[6] The *Browning* court was specifically discussing service bulletins, *see* 2022 WL 5287775, at *3, but I see no reason why the same principle would not apply to recalls.

replacement parts] plausibly plead knowledge."). Plaintiffs, for their part, cite many such cases. (D.I. 40 at 7) (collecting cases).

GM takes issue with Plaintiffs' reliance on customer complaints and testing. (D.I. 27 at 10–12). With respect to customer complaints: "consumer complaints suffice to establish knowledge only where there were an *unusual* number of complaints, such that the manufacturer would be on notice of a specific problem." *Diaz v. FCA US LLC*, 693 F. Supp. 3d 425, 435 (D. Del. 2023) (quoting *Sloan v. Gen. Motors LLC*, 2017 WL 3283998, at *7 (N.D. Cal. Aug. 1, 2017)). In a national market, over the course of roughly four years, GM would sell "hundreds of thousands of vehicles" (D.I. 27 at 10), so the thirty-four complaints that are attached to the Complaint, by themselves, would be highly unlikely to put GM on notice. "[A] company cannot be certain about a systemic part failure based on about 100 instances of failure in a national market over the course several years." *Dawson v. Gen. Motors LLC*, 2019 WL 3283046, at *6 (D.N.J. July 22, 2019); *Diaz*, 693 F. Supp. 3d at 435–36 (collecting cases). Similarly, with respect to testing, GM argues that bare conclusions that testing should have revealed a defect, without more, are not enough to plead pre-sale knowledge. (D.I. 27 at 11). "Nothing in the Complaint . . . explains how the tests . . . revealed the [] Defect, such that [Defendant] could be said to have known of its existence prior to sale." *Diaz*, 2022 WL 4016744, at *31; *Gotthelf v. Toyota Motor Sales, U.S.A., Inc.*, 525 F. App'x 94, 104 (3d Cir. 2013) ("[Plaintiff provides no] facts relating to the alleged . . . internal testing. . . . Such conclusory allegations are insufficient to establish [Defendant's] knowledge, and concealment, of the . . . defect.").

There is a significant amount of authority supporting each side's argument on the issue of pre-sale knowledge. Taken separately, Plaintiffs' allegations regarding service bulletins, testing, and complaints would likely be insufficient, for the reasons noted in GM's cited authorities.

However, "the Court cannot view [one set of allegations] independently from Plaintiffs' remaining allegations regarding [the defendant's] pre-sale knowledge. Rather, at the pleading stage, 'courts must consider the complaint in its entirety and determine whether the complaint as a whole contains sufficient factual matter to state a facially plausible claim.'" *Petro*, 2024 WL 3848433, at *6 (quoting *Robinson*, 2021 WL 3036353, at *7). Taken together, especially in light of the 2023 recall, Plaintiffs' allegations plausibly support the conclusion that GM knew of the Defect before selling the Class Vehicles. At this stage, that is all that is required.

### c. Plaintiffs Plead Fraudulent Omissions with Particularity.

GM argues, "[T]he Court [] should dismiss Plaintiffs' fraud-based claims because they have not pled any omissions, misrepresentations, or reliance with particularity" as required by Rule 9(b). (D.I. 27 at 13). I disagree, except to the extent Plaintiffs allege any misrepresentation claims.

Start with omissions. "The pleading standard is relaxed for fraudulent omissions because 'a plaintiff in a fraud by omission suit will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim.'" *Bolton*, 2024 WL 3328522, at *9 (quoting *Robinson*, 2021 WL 3036353, at *4 (internal citations omitted)).

Here, Plaintiffs allege,

> Notwithstanding GM's knowledge of the Defect, as more specifically explained herein, GM, through media outlets including GM media, touted the ability of the Class Vehicles to be driven reliability (sic). The most basic task of any vehicle is to provide transportation, but GM failed to disclose the Defect interfered with that purpose in any of its statements about the Class Vehicles, including in brochures, Moroney Stickers, warranty booklets, and owner's manuals. GM's statements about both the Equinox and the Terrain consistently touted the safety and fuel economy of the vehicles, without mentioning that the Defect which (sic) had an associated safety risk and negative effect on the fuel economy possible in the vehicles.
>
> . . .

24

GM had numerous opportunities to warn prospective purchasers that the Class Vehicles contained a serious defect that could not only affect the ability of the cars to be driven, but also carried a significant associated safety risk of stalls, hesitation, and lurching, increasing the risk of collisions. But none of the statements that GM published and distributed about the vehicles, including brochures, commercials, fact sheets, window stickers, warranty booklets, and owner's manuals contained any mention of the Defect.

GM further touts the Class Vehicles and makes other express representations and warranties about their quality, durability, and performance. However, in truth, GM knew before selling the Class Vehicles that they suffered from the Defect, but never disclosed that knowledge. Had GM disclosed that knowledge, Plaintiffs and Class members would not have purchased their vehicles or would not have purchased them for the same price.

(D.I. 1 ¶¶ 79, 84, 85). The Complaint provides details from several advertising brochures by way of example. (*Id.* ¶¶ 80–83). That is sufficient to satisfy the purpose of Rule 9(b)'s heightened pleading standard, which is "to place the defendant on notice of the precise misconduct with which it is charged." *Bolton*, 2024 WL 3328522, at *9 (quoting *Robinson*, 2021 WL 3036353, at *5). Similar allegations have survived the pleading stage in other cases. *See, e.g.*, *Bolton*, 2024 WL 3328522, at *8–10 (alleged oil pump defect omitted from advertisements and brochures); *Robinson*, 2021 WL 3036353, at *5 ("infotainment" system defect omitted from "press releases, Monroney stickers, dealership brochures, and [representations by] dealership salespeople"); *Petro*, 2024 WL 3848433, at *4 (valve-train system defect omitted from "specific advertisements and brochures").

The same allegations do not support Plaintiffs' misrepresentation claims, to the extent Plaintiffs allege such claims. Despite noting the numerous opportunities Defendant had to warn Plaintiffs of the defect, the Complaint does not point to specific language—outside of "puffery" such as vague assertions that the Class Vehicles were "safe" and "reliable" (D.I. 1 ¶¶ 3, 79, 241, 303)—in which GM misrepresented a material fact to Plaintiffs. Courts applying Florida and Texas law have repeatedly held that puffery (generalized statements such as "quick" or "fun to

25

drive," *see Diaz*, 693 F. Supp. 3d at 440) cannot form the basis of a misrepresentation claim. *See, e.g., Snowdy v. Mercedes-Benz USA, LLC*, 2024 WL 1366446, at *16 (D.N.J. Apr. 1, 2024) (applying Texas and Florida law, among others, and determining that defendant's representations "cannot provide the basis for a fraud claim because they are mere puffery"); *Diais v. Land Rover Dallas, L.P.*, 2016 WL 1298392, at *4 (Tex. App. Apr. 4, 2016) (applying Texas law and concluding, "[the plaintiff] cannot rely on [the defendant's] statements that the car was the most luxurious, rugged vehicle, with a supercharged, high performance engine because such statements involve mere opinion or puffery"). Plaintiffs do not address this argument in their briefing.[7]

Finally, Plaintiffs have adequately pleaded reliance, which is "presumed where a plaintiff has sufficiently alleged a safety-related defect, and that had the omitted information been disclosed, the plaintiff would have been aware of it and behaved differently." *Robinson*, 2021 WL 3036353, at *10 (cleaned up) (citing *Borkman v. BMW of N. Am., LLC*, 2017 WL 4082420, at *8 (C.D. Cal. Aug. 28, 2017)). Both of those requirements are satisfied here: Plaintiffs have sufficiently alleged a safety-related defect (D.I. 1 ¶¶ 4–16), and have sufficiently alleged that, had the defect been disclosed, they would have been aware of it and behaved differently (*id.* ¶¶ 11, 29, 44, 85, 116, 156, 248, 310). Given all of the above, I find that Plaintiffs have pleaded their fraudulent omission or concealment claims with the requisite particularity.

---

[7] On the other hand, *Bolton* and *Petro* both allowed affirmative misrepresentation claims to proceed past the pleading stage, though those claims were based on similarly vague language. *See Bolton*, 2024 WL 3328522, at *9; *Petro*, 2024 WL 3848433, at *4. It does not appear, however, that the court in either of those cases had occasion to consider whether the defendants' representations were puffery. The *Robinson* court did not reach the puffery question either—it found that the allegations in that case were "based on [the defendant's] alleged omission of material facts, not affirmative misrepresentations." *Robinson*, 2021 WL 3036353, at *5.

### d.  The Issue of Requisite Notice is Moot.

GM argues that Plaintiff Knowles' Deceptive Trade Practices Act claim (Count IX) fails "because he has not provided the requisite notice to assert it." (D.I. 27 at 15). The Texas Deceptive Trade Practices Act requires sixty days' notice. Tex. Bus. & Com. Code § 17.505(a). Plaintiff Knowles provided twelve days' notice. (D.I. 1 ¶ 291). It has since been fourteen months. The action has effectively been abated for the requisite sixty days, *see Hines v. Hash*, 843 S.W.2d 464, 469 (Tex. 1992), rendering this issue moot.

### 3.  Breach of Express and Implied Warranties (Counts IV, V, VII, and VIII): Counts IV and V Are Dismissed.

#### a.  The Kerr Plaintiffs Fail to Allege Breach Within the Warranty Period.

Counts IV, V, VII, and VIII of the Complaint allege breach of express warranty under Florida law, breach of implied warranty of merchantability under Florida law, breach of express warranty under Texas law, and breach of implied warranty of merchantability under Texas law, respectively. (D.I. 1 at 52, 56, 63, 67). GM argues that for any of these counts to state a claim, Plaintiffs must have sought warranty service within the period contained in the warranty (D.I. 27 at 15–17), which they did not. With respect to the Kerrs (Counts IV and V), I agree.

GM's New Vehicle Limited Warranty covers "3 years or 36,000 miles, whichever comes first," from the first use of the vehicle. (D.I. 1 ¶ 78). The warranty also states that GM's "implied warranty of merchantability or fitness for a particular purpose applicable to this vehicle is limited in duration to the duration of this written warranty." (*Id.*). Such written limitations on implied warranties are permitted under Florida and Texas law. *See, e.g.*, *Speier-Roche v. Volkswagen Grp. of Am. Inc.*, 2014 WL 1745050, at *8 (S.D. Fla. Apr. 30, 2014) (Florida); *Salinas v. Ford Motor Co.*, 2015 WL 13121265, at *4 (S.D. Tex. Sept. 3, 2015) (Texas). Therefore, because the Kerrs

only began to experience the Defect after there were "approximately 40,000 miles on the odometer" (D.I. 1 ¶ 31), GM argues that they cannot state a claim for breach of express or implied warranty.

I agree with GM's argument, but only as applied to the Kerrs. *Robinson* provides a helpful summary of the relevant principles:

> A manufacturer's liability for breach of an express warranty derives from, and is measured by, the terms of that warranty. The general rule is that an express warranty does not cover repairs made after the applicable warranty period has elapsed. Accordingly, latent defects discovered after the term of the warranty are not actionable.

2021 WL 3036353, at *16 (cleaned up). Because the Kerrs did not even notice the Defect until after the warranty had expired (D.I. 1 ¶ 31), they may not assert causes of action that necessarily expired alongside the warranty. Knowles, on the other hand, sought repair before the end of the warranty. (*Id.* ¶ 46–48).

Plaintiffs respond by arguing that the warranty is unconscionable. (D.I. 40 at 15–17). But the terms of the warranty at issue here, in covering three years or 36,000 miles, whichever comes first, are not unusual, and many courts have found similar provisions not to be unconscionable. *See Perez v. Volkswagen Grp. of Am., Inc.*, 2013 WL 1661434, at *5 (W.D. Ark. Apr. 17, 2013) (collecting cases). The unconscionability argument is a non-starter.

The Kerrs also argue their warranty claims under a separate warranty: the Powertrain warranty, which covered "the first 5 years or 60,000 miles[,] whichever comes first" (D.I. 1 ¶ 78), but explicitly excluded the "entire pressurized fuel system" (*id.*), including the "in-tank fuel pump" (*id.*). Plaintiffs argue that the Powertrain's exclusion of the fuel pump and the fuel module "when it knew of the inherent Fuel Pump Defect in Class Vehicles and that it had no repair for the Defect" was unconscionable. (D.I. 40 at 16).

This argument seems far-fetched, given that the general warranty covers the fuel system and is not unconscionable, but I briefly address it. Some courts have found that unconscionability existed where a manufacturer "knew the defect[] would manifest and manipulated the warranty term to make sure it did not happen until after the warranty term expired." *In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *11 (D.N.J. May 8, 2017); *Skeen v. BMW of N. Am., LLC*, 2014 WL 283628, at *14 (D.N.J. Jan. 24, 2014) ("Plaintiffs have adequately alleged substantive unconscionability by claiming that Defendants knew the timing chain tensioners would fail and manipulated the warranty terms to avoid paying for it."). However, the Complaint does not allege that GM specifically manipulated the terms of the Powertrain warranty or New Vehicle Limited Warranty with the understanding that the Defect would arise after coverage—indeed, Knowles discovered and sought repair for the Defect before the warranty expired. Furthermore, "merely alleging that a defendant knew of a defect, and knew that defect would arise after the time limitations of a warranty, but concealed that information, *without more*, fails to establish unconscionability." *Xu v. Porsche Cars N. Am., Inc.*, 655 F. Supp. 3d 1214, 1240 (N.D. Ga. 2023), *aff'd*, 2023 WL 7295228 (11th Cir. Nov. 6, 2023). I do not accept Plaintiffs' argument, and I find that the Kerr Plaintiffs have failed to allege a breach within the warranty period. GM's motion is granted with respect to Counts IV and V.

### b. The Kerr Plaintiffs Likely Fail to Allege Privity.

Even if the Kerrs persuasively argued that the warranties were unconscionable, or that the Defect manifested during the duration of the general warranty, there would still remain the question of whether they satisfied Florida law's requirement that plaintiffs seeking to enforce warranty-based claims be in privity with those against whom they assert the claims.[8] "It is well

---

[8] GM raises this argument as to the Kerrs, but not as to Mr. Knowles. (D.I. 27 at 17).

established law in Florida that warranty-based claims, including breach of express warranty, require privity of contract between the parties. . . . No privity exists, and a breach of warranty claim fails, where plaintiff did not purchase the product from the defendant." *Kaiser v. Depuy Spine, Inc.*, 944 F. Supp. 2d 1187, 1193 (M.D. Fla. 2013). Plaintiffs argue that they can avail themselves of a "third-party beneficiary exception to privity" because "they are third party beneficiaries to the contracts between GM and its authorized dealerships, and [] Plaintiffs, *not* the dealership[], are the intended users" of the Class Vehicles. (D.I. 40 at 19). This exception applies when a plaintiff "alleges that he purchased a vehicle from an authorized dealer who was an agent of [the manufacturer], he was the intended consumer of the vehicle, the dealership was not the intended consumer, and the warranty was intended to benefit the consumer, not the dealership." *Weiss v. Gen. Motors LLC*, 418 F. Supp. 3d 1173, 1183 (S.D. Fla. 2019).

Courts applying Florida law are split as to the existence or applicability of this third-party beneficiary exception. *Compare Padilla v. Porsche Cars N. Am., Inc.*, 391 F. Supp. 3d 1108, 1116 (S.D. Fla. 2019) ("Consistent with the overwhelming weight of Florida law, this Court has repeatedly ruled that to establish contractual privity to state a breach of implied warranty claim, plaintiffs must purchase the product at issue directly from the defendant.") (collecting cases) *with Weiss*, 418 F. Supp. 3d at 1183 ("The competing line of cases . . . hold[s] that the plaintiff can establish privity as a third-party beneficiary.") (collecting cases). Because I find that the Kerrs did not seek repair of their vehicle until after the expiration of the warranty, wading into this split is unnecessary. I note, however, that even if I agreed with the Kerrs that the third-party beneficiary exception applied, it would not be clear that the Complaint (D.I. 1 ¶¶ 128–32) plausibly alleges an agent-principal relationship between General Motors and the dealership through which the Kerrs purchased their vehicle, as required by the third-party beneficiary exception. *See, e.g., Ocana v.*

30

*Ford Motor Co.*, 992 So. 2d 319, 326 (Fla. Dist. Ct. App. 2008) (holding at the pleading stage that allegations of a manufacturer's control over dealer location and size, "training and certification of sales and service personnel" and other aspects of the dealership's business did not establish a principal-agent relationship where the allegations were "devoid of any allegation of some of the tell-tale signs of a principal-agent relationship, such as the ability of the principal to hire, fire, or supervise dealership employees or dealer ownership"); *Nuwer v. FCA US, LLC*, 2023 WL 8724014, at *6 (S.D. Fla. Sept. 29, 2023), *modified on reconsideration*, 2023 WL 8698327 (S.D. Fla. Dec. 15, 2023) (observing the district court split on this issue but finding at the summary judgment stage that there was insufficient evidence for a jury to conclude that an agent-principal relationship existed "even if the Court were to accept the existence of [the third-party beneficiary exception]").[9]

Plaintiffs also argue that the Kerrs can avail themselves of a principle whereby "privity exists where a manufacturer provides a direct, written warranty." (D.I. 40 at 18) (citing *George v. Jaguar Land Rover N. Am. LLC*, 2021 WL 5195788 at *7 (D.N.J. Nov. 8, 2021)). The case on which they rely, however, simply applies the third-party beneficiary exception. *See George*, 2021 WL 5195788, at *6 (quoting *Weiss*, 418 F. Supp. 3d 1173, 1182 and reciting the elements for the third-party beneficiary exception therein). Thus, the "direct written warranty" argument does not help the Kerrs.

### c.  Plaintiffs Adequately Plead Lack of Merchantability.

GM argues that Plaintiffs' implied warranty claims fail because their vehicles were not unmerchantable. (D.I. 27 at 17–18). Because merchantability is a "legal conclusion[] which the

---

[9] I am aware that the existence of a principal-agent relationship "is a factual determination the resolution of which would [often] be premature" at the pleading stage. *Nuwer*, 2023 WL 8724014, at *7.

Court does not have to accept" (*id.* at 18) (quoting *Sheris v. Nissan N. Am., Inc.*, 2008 WL 2354908, at *5 (D.N.J. June 3, 2008)), GM invites me to find that "Plaintiffs do not allege any facts suggesting that their vehicles were unfit for their ordinary purpose" (*id.*). The Complaint alleges, however, that the Defect can "cause[] fuel to reach the engine only intermittently or not all, causing a sudden loss of motive power, stalling, hesitating, bucking, noises, failure to start and even complete engine failure." (D.I. 40 at 18) (citing D.I. 1 ¶¶ 4, 31, 46–49, 69). That is more than enough to suggest that the Class Vehicles are unfit for their ordinary purpose. *See, e.g., Maugain v. FCA US LLC*, 2023 WL 1796113, at *17 (D. Del. Feb. 7, 2023) (allegations that class vehicles suffered from a defect resulting in "significant power loss, decreased engine performance, hesitation and/or catastrophic engine failure" supported the conclusion that the class vehicles were not merchantable). I will not dismiss Plaintiffs' implied warranty claims on that basis.

### 4. Count II Is Dismissed.

GM argues that Count II must be dismissed because unjust enrichment is not a standalone claim under Texas law, and because Florida law does not permit an unjust enrichment claim "where there is an adequate legal remedy." (D.I. 27 at 20) (quoting *Am. Honda Motor Co., Inc. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005)). I agree with both arguments.

First, Texas does not recognize an independent cause of action for unjust enrichment. *See Hancock v. Chicago Title Ins. Co.*, 635 F. Supp. 2d 539, 560 (N.D. Tex. 2009) (collecting cases). Plaintiffs do not respond to this argument.

Second, under Florida law, "unjust enrichment is an equitable remedy that is available only when the plaintiff lacks an adequate remedy at law. Here, because [the plaintiff's] unjust enrichment claim is predicated on the same wrongful conduct as her [Florida Unfair and Deceptive

Trade Practices Act] claim, she does not lack an adequate legal remedy." *Matthews v. Am. Honda Motor Co.*, 2012 WL 2520675, at *2 (S.D. Fla. June 6, 2012); *Am. Honda Motor Co. v. Motorcycle Info. Network, Inc.*, 390 F. Supp. 2d 1170, 1178 (M.D. Fla. 2005) (dismissing a counterclaim's unjust enrichment claim where it was "predicated on the same set of allegations supporting their claims under [the Florida Deceptive and Unfair Trade Practices Act]"). Count II is therefore dismissed.

### D. Plaintiffs Have Leave to Amend.

Plaintiffs have leave to amend their Complaint, as requested. (D.I. 40 at 20). It is plausible that Plaintiffs may be able to amend some of their claims so that they state a claim. Plaintiffs are permitted two weeks within which to file an amended complaint.

## IV.    CONCLUSION

An appropriate order will issue.